PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 8/27/96**

TENTH CIRCUIT

---

STEPHEN W. RUPP, Trustee,

　　　Plaintiff - Appellant,

v.

EDWIN MARKGRAF, MARY A.
MARKGRAF,

　　　Defendants - Appellees.

No. 95-4120

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 94-CV-288)

---

John Dustin Morris (Reid Takeoka and Stephen W. Rupp with him on the brief),
of McKay, Burton & Thurman, Salt Lake City, Utah, for Plaintiff-Appellant.

Francis Gerard Fanning, Mesa, Arizona (Steven W. Call of Ray, Quinney &
Nebeker, Salt Lake City, Utah, with him on the brief), for Defendants-Appellees.

---

Before **EBEL**, **KELLY** and **HENRY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

　　Stephen W. Rupp, the Chapter 7 bankruptcy trustee of Cowboy Enterprises,

Inc. ("Cowboy"), appeals the district court's dismissal of an adversary proceeding

to avoid and recover a fraudulent conveyance of Cowboy's property from

appellees Edwin and Mary Markgraf under §§ 544(b) and 550 of the Bankruptcy Code, 11 U.S.C. §§ 544(b) & 550. We exercise jurisdiction under 28 U.S.C. §§ 158(d) & 1291 and remand for further proceedings consistent with this opinion.

## Background

The events that give rise to this action began in 1988, when the Markgrafs became judgment creditors of Forrest Wood "Woody" Davis in the amount of $391,688. By December 1989, Mr. Davis and his wife, Mary, had become principal stockholders and officers in Cowboy. In December 1989, Mr. Davis agreed to pay the Markgrafs $100,000 in exchange for a pickup truck valued at $15,000 and satisfaction of the Markgrafs' judgment against him.

On December 13, 1989, Mrs. Davis instructed First Interstate Bank of Nevada to issue a cashier's check in the amount of $100,000 made payable to Edwin and Mary Markgraf. The cashier's check was purchased using Cowboy funds and it stated on its face that it was purchased by Cowboy Enterprises. Mrs. Davis instructed First Interstate to send the cashier's check "by over night or Fed Ex to: Cowboy Enterprises, Inc. 3535 E. Little Cottonwood Lane, Sandy Utah 84092." This address was not Cowboy's business address, but rather the address where Mr. Davis was living at the time. Subsequently, on December 19, 1989,

the cashier's check was delivered to the Markgrafs, and the Markgrafs delivered a satisfaction of judgment and the pickup truck to the Davises.

In 1992, Cowboy filed for Chapter 11 bankruptcy protection, which was later converted to a Chapter 7 liquidation. The trustee brought this adversary proceeding in 1993 alleging that the transfer was fraudulent and seeking its avoidance and recovery against the Markgrafs under 11 U.S.C. §§ 544(b) & 550. The Markgrafs moved for judgment as a matter of law at the close of the trustee's case. The district court granted the Markgrafs' motion and dismissed the action on the grounds that the bank, and not the Markgrafs, was the "initial transferee" of Cowboy's funds under § 550. Having considered the parties' arguments, we hold that the Markgrafs are liable as initial transferees, and that Forest Wood Davis is liable as the person for whose benefit the transfer was made. The issue of whether or not the transfer was fraudulent is not before us, and we therefore do not address it.

## Discussion

The parties agree that this appeal presents a purely legal issue involving the interpretation and application of § 550 of the Bankruptcy Code, a question that we review de novo. Jobin v. McKay (In re M & L Business Mach. Co.), 84 F.3d 1330, 1334-35 (10th Cir. 1996). Under § 550 of the Bankruptcy Code, when a transfer is avoided under § 544 of the Code, the trustee may recover the

transferred property for the benefit of the estate. Section 550(a) provides that the trustee may recover from:

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). However, the trustee's power to recover is limited by § 550(b), which prevents recovery from immediate or mediate transferees of the initial transferee under § 550(a)(2) who "take[] for value . . . , in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). No such good faith defense is available to the initial transferee or the "entity for whose benefit such transfer was made" under § 550(a)(1); the trustee may always recover from the initial transferee regardless of good faith, value, or lack of knowledge of the voidability of the transfer. Therefore, the central issue in this appeal becomes the determination of which party is the initial transferee of Cowboy's fraudulently transferred funds. If the Markgrafs are the initial transferee, the trustee can recover; if not, the trustee must attempt to recover from the Markgrafs as immediate or mediate transferees, and the Markgrafs may utilize the good faith defense of § 550(b)(1). We hold that the Markgrafs are initial transferees under § 550 of the Bankruptcy Code.

A.

The district court held that the initial transferee of Cowboy's funds was First Interstate Bank of Nevada. The court concluded that the "initial transfer, occurred when Mary Davis said, 'Bank, take Cowboy money and issue to us in return for Cowboy money, cashier's checks.'" Aplt. App. doc. 1 at 6. The court therefore ruled that "[w]here a bank issues a cashier's check, it is an initial transferee of the funds used to purchase the check." Id. at 8. We disagree.

In Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890 (7th Cir. 1988), the Seventh Circuit enunciated what is commonly referred to as the "conduit" theory for determining whether an intermediary, such as a bank, is an "initial transferee" for purposes of § 550. In that case, the debtor (Bonded) sent a check to the bank payable to the bank's order, along with instructions to deposit the money into the account of a third party (Ryan), who was a principal of Bonded. Even though Ryan eventually used those funds to reduce his own indebtedness to the bank, the court held that the bank was not the initial transferee because it had no dominion over the money at the time it initially received the check from Bonded. Id. at 894. As the court reasoned, "[a]s the Bank saw the transaction on January 21, it was Ryan's agent for the purpose of collecting a check from Bonded's bank . . . . The Bank had no dominion over the

$200,000 until January 31, when Ryan instructed the Bank to debit the account to reduce the loan." Id. at 893-94 (citation omitted).

We adopted the Bonded approach in Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortgage Co.), 33 F.3d 42 (10th Cir. 1994), holding that "'the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes.'" Id. at 43-44 (quoting Bonded, 838 F.2d at 893). In that case, the debtor's funds were fraudulently transferred to the defendant bank with instructions to deposit them in the account of Mr. Hobbs. We held that the bank was not the initial transferee because it "was obligated to make the funds available to Mr. Hobbs upon demand and, therefore, it acted only as a financial intermediary." Id. at 44. Moreover, the fact that in both Bonded and Malloy the funds were sent to the bank via an ordinary check rather than a cashier's check does not affect the bank's status as a conduit as opposed to a transferee. See Ross v. United States (In re Auto-Pak, Inc.), 73 B.R. 52, 54 (D.D.C. 1987) (bank was not the initial transferee where principal of debtor converted a check of the debtor into a cashier's check made payable to the IRS).

B.

If the bank merely acted as a conduit, and exercised no dominion and control over Cowboy's funds, then the initial transferee must be either Mr. Davis or the Markgrafs. We conclude that the language and underlying policy of 11 U.S.C. §§ 544(b) & 550, the law of this circuit, as well as persuasive authority from other jurisdictions supports the conclusion that the Markgrafs are the initial transferees, and Davis is the person "for whose benefit such transfer was made."

Our decision in Malloy, adopting the approach taken by the Seventh Circuit in Bonded, indicates that we must apply the dominion and control test to determine the initial transferee of Cowboy's funds. See Malloy, 33 F.3d at 43-44; Bonded, 838 F.2d at 893-94. In doing so we must consider whether Davis exercised the requisite dominion and control over the funds either (1) by the mere act of causing the corporate debtor (Cowboy) to make a fraudulent transfer through his role as a principal of the corporate debtor, or (2) by conduct other than that stemming from his role as a principal of Cowboy. We conclude that Davis did not, through his capacity as principal or otherwise, exercise the type of dominion and control over the funds required in Bonded and Malloy.

Because we have adopted the Seventh Circuit's approach in Bonded, our analysis begins there. As discussed above, in Bonded the debtor corporation (Bonded) sent a check to the bank of its principal, Michael Ryan, with a note

directing the bank to "'deposit this check into [Ryan]'s account.'" Bonded, 838 F.2d at 891 (alteration in original). Ten days later, Ryan instructed the bank to debit this account in order to reduce an outstanding balance on a loan he personally had with the bank. Id. The court concluded that the bank acted as a mere financial intermediary and that it was not the initial transferee under § 550. Id. at 893. In Bonded, the principal had the debtor's funds in his personal account for 10 days before he transferred the funds to a third party (the bank) in satisfaction of a personal debt owed to the bank. Thus, the principal clearly had the "right to put the money to [his] own purposes" for 10 days. Id. at 893. He could have paid the loan, as he did, or "invest[ed] the whole [amount] in lottery tickets or uranium stocks." Id. at 894.

After concluding that, under these circumstances, the bank was not the initial transferee, the court in Bonded went on to state hypothetically, "If the note accompanying Bonded's check had said: 'use this check to reduce Ryan's loan' instead of 'deposit this check into [Ryan]'s account,' § 550(a)(1) would provide a ready answer. The Bank would be the 'initial transferee' and Ryan would be the 'entity for whose benefit [the] transfer was made.'" Id. at 892; see also id. at 895. The distinction between the actual facts in Bonded and the contrasting hypothetical discussed by the court indicates that

> the Bonded Court distinguishes between a one-step transaction in which the debtor's check is paid directly to its principal's creditor,

and a two-step transaction in which the debtor's check is paid to the principal, who then pays his own creditor. In the first case, the creditor is the initial transferee, and the principal is the entity for whose benefit the transfer was made. In the second case, the principal is the initial transferee, and the creditor is the subsequent transferee.

Schafer v. Las Vegas Hilton (In re Video Depot, Ltd.), 186 B.R. 126, 132 (Bankr. W.D. Wash. 1995). The facts of the case before us fit into the category of one-step transactions discussed in Video Depot, and the hypothetical situation discussed in Bonded. Cowboy had a cashier's check issued to the Markgrafs, which was made payable to the Markgrafs and listed Cowboy as remitter. The funds were never deposited into any personal account controlled by Davis and Davis never had dominion or control over the funds. Because he was neither payee nor remitter, Davis could not personally access the funds represented by the cashier's check. He was, at most, a mere courier of the cashier's check from Cowboy to the Markgrafs. As was the case in the Bonded hypothetical, the funds in this case were transferred directly from the debtor (Cowboy) to the principal's creditor (the Markgrafs). Thus, under the Bonded approach, which we have adopted, the Markgrafs are the initial transferees of Cowboy's funds and Davis is the entity for whose benefit the transaction was made.

It is clear that the Bonded court's discussion of dominion and control refers to dominion and control over the funds after the disputed transfer, not dominion

and control over the <u>transferor</u> before the transfer. This point is illustrated by the fact that the court in <u>Bonded</u> presented two sets of contrasting facts, the actual facts before the court and a hypothetical situation. As discussed above, the court concluded that the result would be different in each case. Yet in both cases the principal exercised control over the transferor prior to the transfer of funds and caused the transferor to make transfer. Thus, the court's reasoning in <u>Bonded</u> could not have turned on any evaluation of the principal's control over the debtor.

This interpretation of <u>Bonded</u> was also applied by the Eleventh Circuit in <u>Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)</u>, 904 F.2d 588 (11th Cir. 1990). In <u>Nordberg</u>, the Eleventh Circuit applied <u>Bonded</u> to the following set of facts: (1) Duque was the principal of, and controlled, several companies including Chase & Sanborn, (2) Duque borrowed several million dollars from Arab Banking Corporation ("ABC") personally, and (3) payments from Chase & Sanborn were made on Duque's personal obligation to ABC. 904 F.2d at 591-92. The lower court found that "Duque, not ABC, was the 'initial transferee' because of Duque's control over Chase & Sanborn's actions in transferring the payments to ABC." <u>Id.</u> at 597. The Eleventh Circuit reversed the lower court, applying the principles enunciated in <u>Bonded</u>. The court concluded that ABC was the initial transferee of loan payments made by Chase & Sanborn on behalf of Duque where those payments were made directly to ABC with

- 10 -

instructions to apply the funds to Duque's outstanding loans.  Id. at 599.  The

court stated that

> ABC exercised control over the funds immediately upon receiving
> them, and applied them to reduce a debt owed to ABC; neither Duque
> nor any other party exercised any control over the funds after they
> left Chase & Sanborn.  There was no interregnum, as in Bonded,
> during which the funds sat in Duque's account subject to his use or
> control; indeed, the . . . transfers at issue did not pass even
> momentarily through Duque's account.

Id. at 599-600 (emphasis added).  The court further concluded that Duque's

conduct in forcing Chase & Sanborn to make the transfers was "irrelevant" to the

initial transferee inquiry.  Id. at 598.

The Sixth Circuit in Ray v. City Bank and Trust Co. (In re C-L Cartage Co.,

Inc.), 899 F.2d 1490 (6th Cir. 1990), came to the same conclusion under similar

circumstances.  In Ray, a bank loaned money to the president of a company

personally.  899 F.2d at 1491.  The president then put the money into the

company.  Id.  The company then made some payments directly to the bank in

repayment of the loan.  Id. at 1495.  The court concluded that the bank as creditor

was the initial transferee under § 550 for the payments it received directly from

the company.  Id. ("The bank was the 'initial transferee' [of certain payments]

because the payments were made directly payable to the bank from [the debtor's]

account.") (emphasis added).

In this case, the only "control" Davis exercised over the funds after the check was issued was that he delivered the check to the Markgrafs, thus acting as a courier or agent for Cowboy. However, the court in Bonded clearly indicates that those who act as mere "financial intermediaries" or "couriers" are not initial transferees under § 550. See Bonded, 838 F.2d at 893. The term "transferee" "must mean something different from 'possessor' or 'holder' or 'agent,'" or "anyone who touches the money." Id. at 894. Here, Davis, as courier, could only have prevented the Markgrafs from exercising dominion and control over the funds if he chose to be an unfaithful courier (much like a mailman can prevent a payee of a check mailed to the payee from ever exercising dominion over the funds represented by the check if the mailman decides never to deliver that piece of mail). However, because the check was made payable to the Markgrafs, this control amounts to nothing more than the ability to defeat the Markgrafs' "right to put the money . . . to [their] own purposes." Id. at 893. All couriers have this type of control. In contrast, the dominion and control test from Bonded requires control over the funds and the right to put those funds to one's own purpose, not merely the ability to prevent someone else from doing so. The contrary view, that a courier assumes dominion and control over funds entrusted to the courier, would transform the United States Postal Service into the initial transferee under § 550 in innumerable instances merely by virtue of having been given the right to

deliver financial instruments. The Postal Service would be shocked, no doubt, to learn of the potentially staggering financial liability it was assuming for the price of a thirty-two cent stamp. Furthermore, the fact that the money was being used by the Markgrafs to pay Davis' debt, without more, simply makes Davis the "entity for whose benefit [the] transfer was made." See Bonded, 838 F.2d at 895 ("The paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor -- someone who receives the benefit but not the money.").

The Markgrafs argue that Davis' dominion and control began when he directed Cowboy, as principal, to make the transfer in the first place (i.e., they argued that a "transfer" to Davis occurred when he misappropriated Cowboy's funds by causing Cowboy to direct those funds to his own benefit through payment to the Markgrafs). This argument, however, proves too much. Many principals presumably exercise de facto control over the funds of the corporations they manage. They can choose to cause their corporations to use those funds appropriately or inappropriately. The distinction is only relevant to the question whether the principal's conduct amounted to a breach of duty to the corporation. However, that question is not before us. The issue under § 550 is to what extent the principal, or anyone else for that matter, exercised control over the disputed funds after the funds left the debtor. Determining the initial transferee of a transaction is necessarily a temporal inquiry; there must be a transfer before there

can be a transferee.  The extent to which a principal has de facto control over the debtor before the funds are transferred from the debtor, and the extent to which the principal uses this control for his or her own benefit in causing the debtor to make a transfer, are not relevant considerations in determining the initial transferee under § 550.  See Nordberg, 904 F.2d at 598 ("[T]he extent of [the principal's] control over [the debtor] generally, and over [the debtor's] actions in transferring the disputed funds to [the creditor] in particular, is entirely irrelevant to the 'initial transferee' issue."); but see IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.), 915 F.2d 1049, 1055 & n.3 (6th Cir. 1990) (indicating that the creditor in that case could either be the initial transferee or an immediate transferee, and without deciding, stating in dictum that there is "support for the conclusion that when a corporate officer takes checks drawn from corporate funds to pay personal debts, the corporate officer, and not the payee on the check is the initial transferee"), rev'd on other grounds, 503 U.S. 30 (1992).

In Richardson v. FDIC (In re M. Blackburn Mitchell Inc.), 164 B.R. 117 (Bankr. N.D. Cal. 1994), the court squarely addressed the issue the Markgrafs raise here:  "whether a principal who directs and benefits from a fraudulent transfer of funds from a debtor to a third party is ipso facto the initial transferee within the meaning of § 550 even though the debtor's funds moved directly to the third party; and if not, . . . whether merely by directing the debtor to use a

cashier's check to effectuate the transfer, the principal becomes the initial transferee." 164 B.R. at 124. In Richardson, the FDIC obtained a judgment against Martha Mitchell, the sole shareholder of the corporation. Id. at 121. Mitchell caused the corporation to purchase from the corporation's bank a cashier's check payable to the FDIC in the amount that Mitchell owed the FDIC. Id. The trustee of the corporation in Richardson argued that the FDIC was the initial transferee, and the FDIC claimed (as the Markgrafs claim) that because Mitchell had directed the corporation to pay her personal debt, Mitchell was the initial transferee. The court rejected the FDIC's argument and held that

> [t]he FDIC obtained full dominion and control over the funds with the right to put the money to its own purposes; it was not holding those funds in trust, or as an agent, for any other party. Therefore, applying the rationale of Bonded to the case sub judice, the FDIC is the "initial transferee," and Ms. Mitchell would be the entity "for whose benefit [the] transfer was made."

Id. at 125 (citation omitted, second alteration in original).

We find that Richardson's interpretation of Bonded under these circumstances is persuasive. The court provided the following discussion in support of its interpretation of Bonded and its ultimate conclusion that Ms. Mitchell was not the initial transferee:

> The Court believes that the proper focus when analyzing who is a transferee, is the flow of funds. In order to be an initial transferee, one must be a transferee in the ordinary sense of the word. A transfer that may be avoided under applicable sections of the Bankruptcy Code takes place from the debtor to some entity.

- 15 -

Thus, receipt of the transferred property is a necessary element for that entity to be a transferee under § 550. Simply directing a transfer, i.e., such as by directing a debtor to transfer its funds, is not enough. . . .

This Court does not disagree that in order to be a transferee one must obtain dominion and control over funds. But that does not mean that merely because one has dominion and control of funds (as principals of companies ordinarily do) that one is also a transferee. Rather, in order for there to be a transfer of the debtor's funds, the debtor must dispose of or part with them, that is, such funds must actually leave the debtor. In order to be a transferee of the debtor's funds, one must (1) actually receive the funds, and (2) have full dominion and control over them for one's own account, as opposed to receiving them in trust or as agent for someone else. . . .

The Court concludes that the mere fact that a debtor's fraudulent transfer was directed by a principal of the debtor does not ipso facto transmute that principal into being the "initial transferee" within the meaning of § 550. Reaching the contrary conclusion in order to protect an "innocent" recipient of the transferred funds, is contrary to policy considerations underlying the Bankruptcy Code.

A non-individual debtor such as a corporation or partnership almost always effects a fraudulent transfer through the actions of its principals, or through the principals of its parent corporation, or other similar entity. . . .

Turning every unscrupulous principal into the initial transferee does extreme disservice to § 550, and twists the word "transferee" beyond recognition. It violates the statutory language and purpose and severely and unfairly limits the ability of a trustee to recover misappropriated estate property so as to effect a pro rata distribution among a debtor's creditors who have been defrauded. It would, as a practical matter, operate to block trustees from being able to recover funds fraudulently transferred from debtor's estates in numerous bankruptcy cases.

Rendering the principal an initial transferee to insulate the entity that actually received the money, also gives too much power to

an unscrupulous insider to effect a fraudulent transfer (e.g., to satisfy a personal obligation as was the case here) without allowing a trustee to have the means for avoiding the transfer for the benefit of the debtor's creditors.

Id. at 126-28.

We find this reasoning from Richardson persuasive and rationally based on the principles set forth in Bonded. The reasoning and holding of Richardson was also recently adopted by the Bankruptcy Appellate Panel of the Ninth Circuit. See General Electric Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.), 185 B.R. 801 (Bankr. 9th Cir. 1995). In General Electric, the court held that "the principal of a corporate debtor does not become a 'transferee' by the mere act of causing the debtor [to] make a fraudulent transfer." 185 B.R. at 809. The court stated that "[t]his result is consistent with the fact that corporations must always act through individuals." Id. (citing Richardson, 164 B.R. at 127-28). The court went on to state that

> if the distinction between an initial and a subsequent transferee turns on whether the party benefitting from the transfer "forced" the debtor to make the transfer, then the scope of liability under section 550 is unduly narrowed. Section 550(a)(1) subjects to strict liability not only the initial transferee, but also "the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). The party who forces a debtor to make a transfer is almost always "the entity for whose benefit such transfer was made," and thus is generally always subject to strict liability. Yet Congress intended to make initial transferees also strictly liable for the transfer (subject to the restriction that the trustee is entitled to only one recovery under section 550(c), presently codified at 11 U.S.C. § 550(d)). "The implication is that

- 17 -

the entity for whose benefit the transfer was made is different from a transferee, immediate or otherwise." Consideration of whether the beneficiary of the transfer "forced" the debtor to make the transfer would collapse the two prongs of strict liability into a single party. It would permit entities who are "initial transferees" in the plain sense of the term to escape liability, and deprive the bankruptcy estate (and thus the debtor's creditors) of an additional source for recovery. There is nothing in the statute or otherwise to justify this result.

Id. at 809-10 (citation omitted).

Concluding here, as we do, that Davis is the person for whose benefit the transfer was made and that the Markgrafs are the initial transferees permits the trustee in this case to recover under § 550 from either party. Thus, the trustee has a greater chance of recovering the funds for the benefit of the estate. Section 550 expressly allows the trustee to recover from either party, indicating that, as a matter of policy, the option should be preserved where possible. If we were to conclude that Davis was the initial transferee, the Markgrafs would become "subsequent" transferees, and they would not then be regarded as the persons for whose benefit the transfer was made. Bonded, 838 F.2d at 895 ("[A] subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made.").[1]

_____

[1] The Markgrafs rely primarily on four cases to support their assertion that Davis is the initial transferee, Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.), 168 B.R. 408 (Bankr. D. Ariz. 1994); Kendall v. Sorani (In re Richmond Produce Co.), 151 B.R. 1012 (Bankr. N.D. Cal. 1993), aff'd, 195 B.R. 455 (N.D. Cal. 1996); Robinson v. Home Savings of Am. (In re Concord Senior

Our decision here is also consistent with considerations of equity and fairness. In most, if not all, bankruptcy cases someone is going to be injured. This is especially true when there has been a fraudulent transfer of the debtor's funds. However, Congress has already balanced the equitable considerations under § 550 by distinguishing between initial transferees, who are strictly liable, and subsequent transferees, who are not strictly liable. Initial transferees are in the best position to monitor fraudulent transfers from the debtor. Bonded, 838 F.2d at 892-93 ("The initial transferee is the best monitor; subsequent transferees usually do not know where the assets came from and would be ineffectual monitors if they did."). "[Section] 550(b) leaves with the initial transferee the burden of inquiry and the risk if the conveyance is fraudulent." Id. at 892. The fairness of this approach is illustrated by the case before us. The Markgrafs, as initial transferees of Cowboy's funds, were in the best position to bear the risk of receiving a fraudulent transfer. They received a check purchased by one entity (Cowboy) for the purpose of paying a debt owed to them by another entity

<hr />

Housing Found.), 94 B.R. 180 (Bankr. C.D. Cal. 1988); and Ross v. United States (In re Auto-Pak, Inc.), 73 B.R. 52 (D.D.C. 1987). With respect to the first three cases from bankruptcy courts in the Ninth Circuit, in light of the Ninth Circuit Bankruptcy Appellate Panel's decision in General Electric, these cases are no longer good law to the extent that they support the proposition that a principal becomes a "transferee" by the mere act of causing the debtor to make a fraudulent transfer. With respect to the last case, In re Auto-Pac, we agree with the court in Richardson that the approach taken in In re Auto-Pac "is unpersuasive and in conflict with the ordinary definition of transferee." Richardson, 164 B.R. at 127.

- 19 -

(Davis). However, the check clearly showed Cowboy as remitter. Thus, the Markgrafs had inquiry notice that they potentially were receiving funds to which they were not entitled. They could have protected themselves by making adequate inquiry or requiring Davis to issue them a check from his own account. However innocent the Markgrafs may have been, they presumably were no less innocent than the other creditors of the Cowboy estate who have been injured by this fraudulent transfer of funds from the Cowboy estate. Yet the Markgrafs, as initial transferees, were in a better position to investigate and determine the fraudulent nature of this transfer. By receiving these funds without further investigation or without structuring the payment to make sure the funds came through Davis, the Markgrafs received funds to which they were not entitled. We do not think it is inequitable, under these facts, to make the Markgrafs bear the risk of the fraudulent nature of this transaction rather than Cowboy's other creditors in bankruptcy. In any event, Congress has made its own judgment of who should bear the risk of loss under these situations when it enacted Section 550, and we are bound to accept that judgment.[2]

---

[2] The Markgrafs argue that even if the district court's dismissal of the case was legally flawed, the dismissal is supported by the record as a whole. The district court dismissed this case based solely on its conclusion that the bank was the initial transferee under § 550. In doing so, the district court did not make factual findings regarding the evidence presented for trial sufficient to justify our dismissing the case on appeal. Therefore, we remand the case for further proceedings not inconsistent with this opinion.

## Conclusion

Based upon the forgoing discussion, we **REVERSE** the district court order dismissing this case, and **REMAND** the case for further proceedings not inconsistent with this opinion.

No. 95-4120, Rupp v. Markgraf.

KELLY, Circuit Judge, dissenting.

I cannot agree with the Court that Mr. Davis is not a transferee of Cowboy's funds. I do agree that the bank was merely a conduit; the fact that the funds flowed through the bank is immaterial to the central issue, which is the bank's lack of dominion and control over the funds. The Court similarly strays from the central issue by analyzing the flow of funds through various accounts rather than asking if Mr. Davis, in fact, exercised dominion and control over the funds as required by the test established in <u>Bonded Fin. Serv., Inc. v. European Am. Bank</u>, 838 F.2d 890 (7th Cir. 1988), and adopted by us in <u>Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortgage Co.)</u>, 33 F.3d 42 (10th Cir. 1994). I believe that the most persuasive case law as well as the concerns of equity and fairness support finding Mr. Davis to be the initial transferee and the Markgrafs to be subsequent transferees.

As the Court begins its analysis with the Seventh Circuit's decision in <u>Bonded</u>, so do I. Both <u>Bonded</u> and our decision in <u>Malloy</u> held that a bank which acted as a conduit of funds was not an initial transferee under § 550 because the bank did not exercise dominion and control over those funds. <u>Malloy</u>, 33 F.3d at 44; <u>Bonded</u>, 838 F.2d at 893-94. Neither case directly answered the question of who, if not the bank, is the initial transferee. However, those decisions do indicate that we must apply the dominion and control test to determine whether

Mr. Davis or the Markgrafs is the initial transferee of Cowboy's funds. See

Malloy 33 F.3d at 43-44; Bonded 838 F.2d at 893-94. In IRS v. Nordic Village,

Inc. (In re Nordic Village, Inc.), 915 F.2d 1049 (6th Cir. 1990), rev'd on other

grounds, 503 U.S. 30 (1992), the Sixth Circuit confronted a similar factual

situation. In that case, Joseph Lah, an officer and shareholder of the debtor, drew

a check on the corporate account made payable to a bank, which in turn issued

several cashier's checks to Lah. The cashier's check at issue was made payable to

the IRS, and bore the notation "REMITTER: SWISS HAUS, INC.," under which

name the debtor was doing business at the time. Id. at 1050. The court held that

the IRS was liable, but it did so on the grounds that the IRS did not demonstrate

that it took the cashier's check for value, in good faith, and without knowledge of

the fraud, without reaching the "initial transferee" issue. Id. at 1055-56 & n.3. In

a line of reasoning that is applicable to the case before us, the court stated in

dictum:

> If Lah is viewed as acting for Nordic, then the IRS is the "initial
> transferee." If Lah is viewed as having taken money illegally from
> Nordic, he is the "initial transferee" and the delivery of the cashier's
> check to the IRS makes the IRS an "immediate transferee" of Lah,
> the "initial transferee." If the IRS is considered as an "immediate
> transferee" of Lah, the IRS can prevail if the IRS shows that it took
> for value, in good faith, and without knowledge of the voidability of
> the transfer.

Id. at 1055 (footnote omitted).[3]

Based on this reasoning, it seems clear that Mr. Davis is the initial transferee of Cowboy's funds. The Davises purchased the cashier's check using Cowboy funds, and then used it to satisfy Mr. Davis's personal indebtedness to the Markgrafs. Surely, under these circumstances, Mr. Davis must be viewed as having taken Cowboy's money illegally, see Nordic, 915 F.2d at 1055, making him the initial transferee of the fraudulent conveyance.

Other case law supports this conclusion. In Ross v. United States (In re Auto-Pak, Inc.), 73 B.R. 52 (D.D.C. 1987), the owner of the debtor company converted a check of the debtor intended for the IRS into a cashier's check drawn on the debtor's account made payable to the IRS. He then directed the cashier's check to the IRS with a notation to apply it toward taxes owed by another, non-bankrupt, corporation he owned. Sitting in an appellate capacity, the district court held that by converting the debtor's check into a cashier's check and writing the name of another corporation on it, the owner "essentially took control of the funds underlying the cashier's check. . . . It would defy logic to hold an innocent

---

[3] As indicated above, the Supreme Court later reversed the Sixth Circuit's decision in Nordic. 503 U.S. 30 (1992). However, it did so on the alternative ground that the judgment against the government was jurisdictionally barred by the doctrine of sovereign immunity. Id. at 39. In disposing of the case on jurisdictional grounds, the Court expressed no opinion at all regarding the merits.

and mediate party such as the IRS a party to this alleged fraudulent conveyance." Id. at 54.

Another case, Kendall v. Sorani (In re Richmond Produce Co.), 151 B.R. 1012 (Bankr. N.D. Cal. 1993), illustrates how a principal can rise to the level of a transferee by exercising sufficient control over a transaction. In Kendall, the court noted:

> The evidence is clear that Clow [the principal] picked up the Cashier's Check from Mechanics Bank and delivered it to BanCal. . . . If a messenger service had picked up the Cashier's Check from Mechanics Bank and delivered it to BanCal, the messenger service would not have been deemed a transferee. . . .
>
> However, clearly, Clow was no mere messenger. Rather, Clow exercised complete control over the transaction. It was devised and executed for his benefit. Under these circumstances, the Court must conclude that the Cashier's Check was transferred to Clow when he picked it up from Mechanics Bank.

Id. at 1021.

In the present case, Mr. Davis and his wife exercised a similar degree of control over the transaction. The Davises chose to instruct the bank to make the cashier's check payable to the Markgrafs, but, in their position as principals of Cowboy, they could have ordered the bank to issue the cashier's check to anyone, and for any purpose. Mr. Davis then delivered the cashier's check to the Markgrafs in satisfaction of his personal debt. Moreover, the fact that the bank sent the cashier's check to Mr. Davis's home address illustrates his dominion and

- 4 -

control over the funds. Once he had possession of the cashier's check, Mr. Davis could have returned it to the bank, altered it in some way, or otherwise chosen not to deliver it. See Laird v. Bartz (In re Newman Cos.), 140 B.R. 495, 498 (Bankr. E.D. Wis. 1992). Of course, if the cashier's check had never reached the Markgrafs, the Markgrafs would not be deemed a transferee of the funds. I cannot agree with the Court's contention that Mr. Davis was "at most, a mere courier." Ct. Op. at 9. The intermediate steps taken by the Davises evince the dominion and control required to find them to be the initial transferees.

Finally, in Robinson v. Home Sav. of Am. (In re Concord Senior Hous. Found.), 94 B.R. 180 (Bankr. C.D. Cal. 1988), the debtor hired Karl Gerwer, doing business as Charter Pacific Management, Inc. ("CPM"), to manage its apartment building. Gerwer collected rent for debtor and deposited it into a certificate of deposit at defendant bank in the name of Gerwer and CPM only. Subsequently, Gerwer used the deposited amounts as collateral to secure loans by Gerwer from the bank for his personal use. When Gerwer defaulted, the bank seized the CD. When the trustee tried to recover the seized funds from the bank, the court held that Gerwer, not the bank, was the initial transferee. The court held that "[t]he initial transfer of property from [debtor's] estate occurred when Gerwer used the CD for his own benefit by pledging it to secure his loans." Id. at 183. This misappropriation of the estate's funds by the estate's agent constituted

- 5 -

a transfer of those funds to the agent.  Similarly, when the Davises stepped outside of their role as principals of Cowboy and effectuated a fraudulent conveyance of Cowboy's funds to satisfy a personal obligation of Mr. Davis, Mr. Davis became the initial transferee of those funds.

The majority relies heavily on Richardson v. FDIC (In re Blackburn Mitchell, Inc.), 164 B.R. 117 (Bankr. N.D. Cal. 1994), and General Electric Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.), 185 B.R. 801 (Bankr. 9th. Cir. 1995), to reject the above cited cases as bad law and hold that Mr. Davis is not the initial transferee, but rather the "entity for whose benefit such transfer was made."         I disagree with this reasoning.  It is true, as the Bankruptcy Appellate Panel stated in General Electric, that corporations must always act through individuals.  185 B.R. at 809.  However, there is an important difference between a principal's actions on behalf of a corporation for corporate purposes, albeit misguided, and actions for purely personal purposes.  Making such a distinction does not "collapse the two prongs of strict liability [for initial transferees and entities for whose benefit the transfer was made] into a single party, as the General Electric Court warns.  Id.  Rather, it merely recognizes that the statute does not hold two separate parties strictly liable in all cases, but only in those where there are separate identifiable parties who are the "initial transferee" and the "entity for whose benefit such transfer was made."  As I

believe Mr. Davis is a transferee, he cannot be the entity for whose benefit such transfer was made.

Moreover, the Richardson case, on which the reasoning of General Electric is largely based, both misapplies the legal rule established in Bonded, and is distinguishable on its facts. The Richardson court explained:

> The Court believes that the proper focus when analyzing who is a transferee, is in the flow of funds. In order to be an initial transferee, one must be a transferee in the ordinary sense of the word.
> . . . .
>
> This Court does not disagree that in order to be a transferee one must obtain dominion and control over funds. But that does not mean that merely because one has dominion and control of funds (as principals ordinarily do) that one is also a transferee. . . . In order to be a transferee of the debtor's funds, one must (1) actually receive the funds, and (2) have full dominion and control over them for one's own account, as opposed to receiving them in trust or as agent for someone else.

Id. at 126. This is not what Bonded holds. The Bonded court specifically shifts the emphasis from the mechanical movement of money through accounts and establishes the dominion and control test. Bonded, 838 F.2d at 893. It is clear that "transferee" cannot simply be defined under the "ordinary sense of the word;" rather, Bonded holds that "'[t]ransferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent.'" Id. at 894. In Richardson, the court created an overly restrictive definition by combining the dominion and control requirement of Bonded with the "ordinary" meaning of

"transferee" as someone who actually holds the funds in his account. Of course, not every principal in a business, who ordinarily would have dominion and control over company funds, should be considered a transferee. As discussed above, there is a difference between a principal acting in his official capacity and a principal who abuses his official role and effectively steals money from his company to achieve personal rather than corporate purposes. See Nordic, 915 F.2d at 1055. It is this second type of principal whose wrongdoing causes him to abandon his official capacity and exercise personal dominion and control over corporate funds. The facts of this case clearly support the conclusion that Mr. Davis and his wife exercised personal dominion and control over Cowboy's funds by improperly using their official status to satisfy personal obligations. These facts demonstrate more clearly than in Richardson that Mr. Davis did exercise the requisite dominion and control to be considered the initial transferees. Arguably, Ms. Mitchell in Richardson could be compared to the hypothetical situation in Bonded in which Ryan in his official capacity tells the bank to "use this check to reduce Ryan's loan." In that case, the court explained that the bank, and not Ryan, would be the initial transferee. Bonded, 838 F.2d at 892. Here, however, the situation of Mr. Davis is more akin to the dominion and control exercised by parties who were found to be initial transferees in the cases discussed above. See Kendall, 151 B.R. at 1021; Robinson, 94 B.R. at 183.

If, as the Court contends, Mr. Davis is the "entity for whose benefit such transfer was made," the Markgrafs would be the initial transferees. However, not every case includes a party who can be labeled as the "entity for whose benefit such transfer was made." In <u>Bonded</u>, the court makes clear that "the categories 'transferee' and 'entity for whose benefit such transfer was made' are mutually exclusive." <u>Bonded</u>, 838 F.2d at 896; <u>see also</u> <u>Danning v. Miller (In re Bullion Reserve of N. Am.)</u>, 922 F.2d 544, 548 (9th Cir. 1991). Therefore, in a simple example where the debtor fraudulently transfers funds to A, who in turn transfers them to B, there is no party who can be properly described as the "entity for whose benefit such transfer was made." A is the initial transferee and B is an immediate or mediate transferee.

The single distinguishing characteristic of an "entity for whose benefit such transfer was made" is, therefore, that it is not a transferee under § 550. Rather, in order to avoid redundancy, I interpret the phrase "entity for whose benefit such transfer was made" to describe a party that exists outside of the chain of transfer, but who nonetheless receives a direct benefit from the occurrence of the transfer, such as a guarantor of a loan or other third party beneficiary. <u>Accord</u> <u>Laird</u>, 140 B.R. at 498-99 ("The structure of section 550 distinguishes transferees . . . from entities that get a benefit because someone else received the money or property. Since the bank was a subsequent transferee, it could not be the 'entity for whose

benefit' the initial transfer was made."). Employing the test of <u>Bonded</u> and its progeny, an "entity for whose benefit such transfer was made" must therefore be a party that does not exercise dominion and control over the transferred funds and is outside the chain of transfer. The facts presented clearly support finding Mr. Davis to be a transferee; consequently, under <u>Bonded</u>, he cannot be "the entity for whose benefit such transfer is made." Mr. Davis was no mere courier; his improper intent and dominion and control over the transaction is crystal clear, compelling my conclusion that he was a transferee of the funds, and more specifically, the initial transferee. As Mr. Davis is the initial transferee, the Markgrafs are subsequent transferees who can utilize the good faith defense of § 550(b)(1).

Because the Court chooses to limit its focus to the form of the transaction, totally ignoring its substance, I respectfully dissent.