In re FINLEY, KUMBLE, WAGNER, HEINE, UNDERBERG, MANLEY, MYERSON & CASEY, Debtor.

Arthur H. CHRISTY, as Trustee of the Finley Kumble, et al Malpractice Insurance Trust, Plaintiff–Appellant,

v.

ALEXANDER & ALEXANDER OF NEW YORK INC.; Alexander International Insurance Services, Ltd.; Alexander Howden Insurance Brokers, Ltd., Defendants-Appellees.

No. 1596, Docket 96–5125.

United States Court of Appeals, Second Circuit.

Argued July 14, 1997.

Decided Nov. 26, 1997.

John F. Cambria, New York City (Salvatore A. Santoro, Frank E. Derby, Daniel R. Milstein, Christy & Viener, on the brief), for Plaintiff–Appellant.

Wayne R. Glaubinger, New York City (Lawrence S. Greengrass, Mound, Cotton & Wollan, on the brief), New York City, for Defendants–Appellees.

Before: WINTER, Chief Judge, JACOBS, and LEVAL, Circuit Judges.

JACOBS, Circuit Judge:

The question presented on this appeal is whether an insurance broker, having recommended the purchase of insurance (assumed to have afforded no useful coverage) to a firm that was then insolvent and soon after bankrupt, was an "initial transferee" within the meaning of 11 U.S.C. § 550(a) in respect of

an allegedly fraudulent transfer under 11 U.S.C. § 548(a)(2) when the broker transferred the premium payment from the policyholder to the insurance company.

Prior to its decision to dissolve in December of 1987, the law firm of Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey ("Finley Kumble") consulted with its insurance broker, Alexander & Alexander of New York, Inc. ("A & A")[1] to decide what to do about the firm's coverage for professional liability. On A & A's recommendation, Finley Kumble allocated its limited resources to buy a three-year extension of the claims reporting period on its existing primary coverage, which was a $15 million claims-made policy issued by American Home Assurance Co. ("American Home"). This "discovery tail" did not increase the coverage limits.

In 1988, Finley Kumble's creditors filed an involuntary petition under Chapter 7 of the Bankruptcy Code, a proceeding that the Bankruptcy Court for the Southern District of New York later converted to a proceeding under Chapter 11. The Plan of Reorganization, confirmed in December of 1991 (Abram, B.J.), made provision for payment of legal malpractice claims (i) by creating a Malpractice Insurance Trust to sort out and fund the claims, (ii) by assigning to the Insurance Trust the estate's rights and claims against (*inter alia*) Finley Kumble's malpractice insurers and A & A, and (iii) by naming Arthur H. Christy ("Christy") as trustee.

In June of 1990, Christy sued A & A in an adversary proceeding in the Bankruptcy Court, asserting common law claims (malpractice, negligence, breach of contract, and breach of fiduciary duty) as well as a claim to recover from A & A, as an avoidable transfer under 11 U.S.C. § 548(a)(2), the premium that Finley Kumble paid for the discovery tail, on the theory that (i) the premium was paid within one year of the filing, while Finley Kumble was insolvent, (ii) the discovery tail did not afford coverage reasonably commensurate with the $4.375 million premium, and (iii) A & A was the "initial transferee" of

the premium within the meaning of 11 U.S.C. § 550(a).

After the Bankruptcy Court transferred that proceeding to the district court (Sprizzo, J.), the parties stipulated to the voluntary dismissal with prejudice of all the common law claims. A & A then moved for summary judgment dismissing the avoidable transfer claim on the grounds that (i) having exercised no dominion over the premium amount, A & A acted as a "mere conduit" of the premium for the discovery tail, and therefore was not an initial transferee under principles articulated in *Bonded Financial Servs. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988), and (ii) the discovery tail did in fact represent reasonably equivalent value for the premium paid. The district court found that material issues of fact barred summary judgment on the issue of reasonably equivalent value, but granted summary judgment chiefly on the ground that the *Bonded Financial* analysis was sound, and that A & A, having exercised no dominion or control, was a mere conduit rather than an initial transferee.

On appeal, Christy argues, *inter alia*, that (i) the *Bonded Financial* test should not be adopted in this Circuit for determining initial transferee status; (ii) even if we adopt that test, summary judgment is defeated by material issues of fact as to whether A & A, as an active participant in the design and execution of Finley Kumble's insurance program, can properly be deemed a mere conduit; and (iii) the discovery tail did not represent "reasonably equivalent value" for the premium paid. Because we agree with the district court that A & A was not an "initial transferee," we affirm the judgment.

## BACKGROUND

Finley Kumble authorized A & A to serve as Finley Kumble's broker of record for the 1987–88 policy year on July 1, 1987. A & A proceeded in the summer and fall of 1987 to design and place Finley Kumble's 1987–88 policy year program for coverage effective as of July 14, 1987.

---

1. Sued here as defendants-appellees Alexander & Alexander of New York, Inc., Alexander International Insurance Services, Ltd., and Alexander Howden Insurance Brokers, Ltd.

For a premium of $3.5 million, A & A purchased single-year primary professional liability coverage from American Home, which had been Finley Kumble's primary insurer on that risk since at least 1982. American Home's policy furnished coverage on a claims-made basis; that is, it covered claims first made against Finley Kumble and reported to the insurer during the policy period. The policy limits were $15 million, and the policy specified a $1 million per claim deductible and a $4 million aggregate self-insured retention.

A & A also procured four excess layers of professional liability coverage from a number of insurers, totaling $76,875,000 above the primary coverage, deductible and retention. A & A inadvertently left Finley Kumble with an uninsured $1,375,000 gap at the third excess layer.

At the time of issue, the American Home primary policy provided that upon cancellation, non-renewal, or termination, Finley Kumble was entitled to purchase for an additional premium an optional extended reporting period—the discovery tail—subject to the original $15 million limit. In November 1987, A & A advised Finley Kumble of certain retroactive endorsements, including Endorsement 3 (the "New York Amendatory Endorsement") which changed the policy terms by providing that the purchase of the discovery tail would both extend the reporting period *and* add another $15 million to the aggregate limit.[2]

Christy charges that A & A cannot be viewed as a "mere" conduit because it is culpable in the following ways: (i) A & A fell several hundred thousand dollars short of its initial undertaking to arrange $100 million in coverage for the 1987–88 policy year; (ii) A & A arranged some of the excess coverage from London insurers that were then insolvent or otherwise financially impaired, and that ultimately failed to pay on Finley Kumble claims; (iii) A & A took inadequate measures to afford notice of claims to certain excess insurers that required direct and prompt notice of every claim regardless of whether the *ad damnum* appeared to impli-

cate their coverage layers; and (iv) A & A advised Finley Kumble to purchase the discovery tail, the terms of which afforded no appreciable incremental coverage, in exchange for the $4.375 million premium. The fourth ground requires elaboration.

Near the end of 1987, a number of Finley Kumble partners adopted a "Plan of Termination," to take effect on January 4, 1988, that contemplated (*inter alia*) that the partnership would end its law practice, but would continue to maintain professional liability insurance even beyond the expiration of its existing coverage. American Home offered A & A two coverage options: (A) a buy-back of the $4 million self-insured retention effective on December 31, 1987, subject to the $1 million deductible, or (B) purchase of a discovery tail that would make available the "unimpaired portion of the existing [$15 million] limit" for either one or three years. American Home pointed out that the second option would be "more restrictive than that which is granted" by the New York Amendatory Endorsement.

A & A explained American Home's proposed options to Finley Kumble in a letter and accompanying materials that memorialized Finley Kumble's representation to A & A that at that time Finley Kumble knew of no losses that would penetrate its aggregate $5 million self-insured retention. A & A's letter then added that the absence of such losses, "coupled with the fact that the other options were unaffordable," led A & A to request a quote for a discovery tail without the feature that would reinstate the limits. A & A negotiated the premium for a three-year extended reporting period down from $5.250 million to $4.375 million, and Finley Kumble instructed A & A to purchase a three-year discovery tail on Finley Kumble's behalf. The tail provided a three-year extended reporting period (from January 1, 1988 through January 1, 1991), but afforded no additional indemnity dollars beyond the original $15 million limit. According to the Finley Kumble partner who interfaced with A & A, Finley Kumble decided to extend the reporting period without increasing the limit

---

**2.** The additional premium was to be within the following ranges: (1) 100–150% of the last annu-

al premium for a one-year tail, or (2) 125–250% of the last annual premium for a three-year tail.

for the simple reason that Finley Kumble "didn't have the money."

Relying on the tail, Finley Kumble canceled the primary and excess coverage in respect of claims made after January 1, 1988, and paid for the tail with $1.375 million in available cash and the return premiums from the cancellation of the other coverages. The flow of funds was accomplished in the following manner:

- On January 1, 1988, American Home internally applied the return premium due Finley Kumble for cancellation of the policy—$1.673 million—directly to the tail premium.
- On January 8, Finley Kumble issued a check for $1.375 million to A & A for partial payment of the tail; on January 18, A & A issued a $1.375 million check to American Home.
- On January 22, A & A issued a check to American Home for $456,632, which constituted return premiums recovered from Finley Kumble's excess insurers.
- On January 29, Finley Kumble issued a check to A & A in the amount of $300,-000.
- On February 3, A & A sent a check to American Home for $1,213,736. This included the $300,000 received from Finley Kumble on January 29 and additional return of premium from the excess insurers.
- Finally, on February 9, A & A sent a check to American Home for $156,632, which constituted further return of premium from the excess insurers.

Thus, A & A promptly remitted to American Home all funds received from Finley Kumble or the excess insurers, usually within a matter of days. Although it was entitled to do so, A & A retained no commission for purchase of the tail.

As of December 31, 1987—the day before the beginning of the tail period—23 legal-malpractice claims had been filed against Finley Kumble. The aggregate total of the *ad damnum* clauses was nearly $86 million. With the approval of the Bankruptcy Court, the trustee eventually settled all of these claims for a total of $26,335,000. In short, it turned out that the $15 million primary limit would have been wholly exhausted by claims that were filed prior to the tail period.

On August 17, 1995, A & A moved: (i) to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(1), on the ground that the complaint was essentially a state law negligence and malpractice claim; and (ii) for a grant of summary judgment on the independent grounds that A & A was a mere conduit for the $4.375 million tail premium and that Finley Kumble received reasonably equivalent value for the tail. Christy cross-moved for partial summary judgment on the ground that Finley Kumble did not receive reasonably equivalent value for the transfer; the trustee also attacked A & A's "mere conduit" argument.

The district court denied A & A's motion for summary judgment on the reasonable value issue, finding material issues of fact, but granted A & A's motion for summary judgment on the ground that A & A was not an initial transferee from whom the transferred funds could be recovered.

The district court also held that, even if A & A was the initial transferee, Christy could not recover from A & A once it had transferred the premiums to American Home, nor could Christy recover from A & A once the Chapter 11 trustee had settled with American Home, because § 550(a) does not permit a double recovery.

## DISCUSSION

We review a grant of summary judgment *de novo* and view the facts in the light most favorable to the non-movant. *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993).

### A. The "Initial Transferee"

The trustee of a bankrupt estate has broad powers under the Bankruptcy Code to avoid certain transfers of property made by the debtor either after or shortly before the filing of the bankruptcy petition. In this way, the transferred property is returned to the estate for the benefit of all persons who have presented valid claims. Section 548(a)(2) allows the trustee to avoid a transfer if the

debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and "was insolvent on the date that such transfer was made." 11 U.S.C. § 548(a)(2). In the present case, Christy alleges that Finley Kumble was insolvent at the time that it transferred to A & A (or authorized A & A to collect on its behalf) the funds paid to secure the discovery tail, which Christy contends was worthless.

Christy further argues that he can collect the avoided payment from A & A as an "initial transferee." Section 550 of the Bankruptcy Code identifies the persons from whom an avoided payment may be recovered:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548 ..., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) *the initial transferee of such transfer* or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a) & (b) (emphasis added). The trustee may therefore recover from the initial transferee and its subsequent transferees, or from any entity for whose benefit the initial transfer was made. The Bankruptcy Code, however, does not define "initial transferee."

Certain bankruptcy courts have concluded that the owner of the first pair of hands to touch the property is the initial transferee. Those courts then look to the exercise of their equitable powers to excuse innocent and casual "initial transferees" from responsibility under § 550(a), *see, e.g., Metsch v. First Alabama Bank of Mobile (In re Colom-*

*bian Coffee Co.),* 75 B.R. 177, 179–80 (S.D.Fla.1987), while holding liable those initial transferees who fail to act in good faith. *See, e.g., Huffman v. Commerce Sec. Corp. (In re Harbour),* 845 F.2d 1254, 1257–58 (4th Cir.1988) (mother of ultimate transferee not excused when she was wilfully blind to the fact that funds were being fraudulently handled). Under this construction, every courier, every bank and every escrow agent may be subjected to a great and unimagined liability that is mitigated only by powers of equity. This comes close to making equity a principle of statutory construction. The effect of such a principle would be to render every conduit vulnerable to nuisance suits and settlements. The Seventh Circuit has characterized as "misleading" the use of equity to separate sheep from goats under § 550(a)(1):

[t]o treat "transferee" as "anyone who touches the money" and then to escape the absurd results that follow is to introduce useless steps; we slice these off with Occam's Razor and leave a more functional rule.

*Bonded Financial,* 838 F.2d at 894.

We think the wording of section 550(a) is not so plain as to compel, or persuasively argue for, the principle that every conduit is an initial transferee. The statutory term is "transferee"—not "recipient"—and is not self-defining. *See id.* Numerous courts have recognized the distinction between the initial recipient—that is, the first entity to touch the disputed funds—and the initial transferee under section 550. *See, e.g., Rupp v. Markgraf,* 95 F.3d 936, 940 (10th Cir.1996) ("courier" of check from debtor to principal's creditor not an initial transferee); *Malloy v. Citizens Bank (In re First Security Mortgage Co.),* 33 F.3d 42 (10th Cir.1994) (bank); *Security First Nat'l Bank v. Brunson (In the Matter of Coutee),* 984 F.2d 138 (5th Cir. 1993) (law firm holding funds in trust account); *In re Colombian Coffee Co.,* 75 B.R. at 179 (bank); *Salomon v. Nedlloyd, Inc. (In re Black & Geddes),* 59 B.R. 873 (Bankr. S.D.N.Y.1986) (steamship agency acting as collection agent); *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.),* 33 B.R.

334 (Bankr.S.D.N.Y.1983) (law firm acting as escrow agent).

The statutory structure confirms that the term "initial transferee" references something more particular than the initial recipient. Section 550(a)(1) groups initial transferees with "entit[ies] for whose benefit such transfer was made" and subjects both groups to strict liability. Chiefly because "immediate and mediate" transferees are the subject of the following subsection (§ 550(a)(2)), we know that the "entity for whose benefit" phrase does not simply reference the next pair of hands; it references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds. *See Danning v. Miller (In re Bullion Reserve),* 922 F.2d 544, 548 (9th Cir.1991); *Bonded Financial,* 838 F.2d at 895; *Haley v. Sorani (In re Richmond Produce Co.),* 118 B.R. 753, 760 (Bankr.N.D.Cal.1990). Because such persons are liable under (a)(1) only in respect of "such [initial] transfer," it stands to reason that the initial transfer is something other than the passing of mere possession. Indeed, if couriers and other mere conduits were deemed "initial transferees," some surely unintended consequences would ensue:

● The entity that initially receives the property from the debtor *via a courier* would not be the *initial* transferee (because of the courier's intervention) and would not be an entity "for whose benefit such transfer was made" (because of it physically receiving the funds). Such an entity would thereby escape the strict liability that (a)(1) contemplates, and instead would receive the property as an "immediate or mediate transferee" subject to the good-faith standard under (a)(2).

● The guarantor who benefits from the underlying transaction would escape the strict liability that (a)(1) contemplates (being neither the courier nor an entity that benefits from the *courier's* receipt of the property), as well as liability under (a)(2) as an "immediate or mediate transferee" (having never itself physically received the property, *see Merrill v. Dietz (In re Universal Clearing House Co.),* 62 B.R. 118, 128 n. 12 (D.Utah 1986)).

The district court granted summary judgment to A & A in part on the ground that, with respect to the challenged transfer of funds, A & A was a mere conduit:

I don't think that Congress intended, from the literal verbiage of the language itself, that the word "transferee" means the person to whom it is transferred. I don't think it is an unfair reading of that to say[:] the entity to whom the payment is made.... The person who is the recipient is the one to whom the funds ultimately should go....

We agree.

Every Court of Appeals to consider this issue has squarely rejected a test that equates mere receipt with liability, declining to find "mere conduits" to be initial transferees, under the principles first articulated in *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.),* 33 B.R. 334 (Bankr.S.D.N.Y. 1983) (Galgay, *B.J.*). For example, in *Bonded Financial,* an insider of the debtor corporation had caused the transfer of corporate funds to his personal bank account, and then directed the bank to debit his account in that amount and to apply the funds to reduce the indebtedness to that bank of another entity he owned. 838 F.2d at 891. The trustee in bankruptcy sued to recover the funds from the bank. The Seventh Circuit, adopting what has come to be known as the dominion and control test, ruled that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 893. Noting that the bank "acted as a financial intermediary" and "received no benefit," *id.,* the court concluded:

[t]he [b]ank had no dominion over the $200,000 until ... [the insider] instructed the [b]ank to debit the account to reduce the loan; in the interim, so far as the [b]ank was concerned, [the insider] was free to invest the whole $200,000 in lottery tickets or uranium stocks.

*Id.* at 894.

The Seventh Circuit's logic has been widely adopted. *See, e.g., Malloy,* 33 F.3d at 44 (bank was not an initial transferee because it held funds "only for the purpose of fulfilling an instruction to make the funds available to

someone else") (citation and quotation omitted); *Security First*, 984 F.2d at 140–41 (law firm was not initial transferee where it held funds in trust account for a client); *Danning*, 922 F.2d at 548–49 (where recipient of money had contractual obligation to immediately transfer funds, he was not initial transferee even though the funds were eventually spent for his benefit); *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199–1200 (11th Cir.1988) (observing that "[w]hen trustees seek recovery of allegedly fraudulent conveyances from banks, the outcome of the case turns on whether the banks actually controlled the funds or merely served as conduits"); *See also Carson v. Federal Reserve Bank*, 254 N.Y. 218, 236, 172 N.E. 475 (1930) (Cardozo, *C.J.*) ("The person to be charged with liability, if he has parted before the bankruptcy with title and possession, must have been more than a mere custodian, an intermediary or conduit between the bankrupt and the creditor.").

■ We join these other circuits in adopting the "mere conduit" test for determining who is an initial transferee under § 550(a)(1).[3] The next question is whether A & A meets this test.

## B. A & A's Role in the Questioned Transactions

■ A & A performed more than one role in the events. It transferred premiums from Finley Kumble and the excess insurers to American Home to pay for the discovery tail; but it also advised Finley Kumble on risk management (generally, as well as specifically concerning the discovery tail) and had a role in the handling of claims, at least insofar as transmitting notice of claims to excess insurers. Christy relies on A & A's undisputed additional functions to assert that A & A is no "stranger" to either the debtor or the underlying transaction that set the funds in

motion, and argues that A & A therefore does not qualify as a mere conduit. *See,e.g., Lowry v. Security Pacific Bus. Credit (In Re Columbia Data Prods.)*, 892 F.2d 26, 28 (4th Cir.1989) (distinguishing between (i) defendant that lacked a direct business relationship with the debtor, and was a mere conduit and (ii) defendant with a direct relationship to the debtor, and was no mere conduit). We can agree that A & A was no stranger to Finley Kumble or the discovery-tail transaction. But we do not think that the existence of a commercial relationship determines the issue. *See, e.g., Bonded Financial*, 838 F.2d at 893 (bank was a lender to one of debtor's companies and debtor held an account at bank, but bank was nonetheless a mere conduit); *Gropper*, 33 B.R. at 336 (law firm had attorney/client relationship to debtor but was mere conduit); *Hooker Atlanta*, 155 B.R. at 336 (vendor's broker on sale of real estate is a mere conduit).

Christy's related—and stronger—argument is that the discovery tail was worthless to Finley Kumble when purchased, because previously-filed claims easily exceeded the existing $15 million limit that the tail did not increase. This argument knits together many of Christy's initial claims against A & A, chiefly Christy's challenges to A & A's professional risk management services, claims (stated in Counts Three, Four, and Five of the Third Amended Adversary Complaint) that were voluntarily dismissed with prejudice by Christy in a May 23, 1995 Stipulation and Order. The question is whether these same allegations can defeat A & A's status as a mere conduit in the transfer of funds used to purchase the discovery tail.

We decline to freight the section 550 inquiry with Christy's common law claims and related allegations, none of which suggest that the funds transferred were for A & A's account, or were diverted to its account, or otherwise challenge A & A's conduct *in its*

---

3. Numerous bankruptcy courts, including those in this circuit, have also used a mere conduit test to assess initial transferee status. *See Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.)*, 155 B.R. 332, 337 (Bankr.S.D.N.Y. 1993) ("Parties that act as conduits and simply facilitate the transfer of funds or property from the debtor to a third party generally are not deemed initial transferees for purposes of [11 U.S.C. § 550]"); *In re Moskowitz*, 85 B.R. 8, 11 (E.D.N.Y.1988) ("innocent conduit" is not an initial transferee); *Salomon*, 59 B.R. at 875 ("mere conduit" is not an initial transferee; therefore, § 550 recovery is not available); *Gropper*, 33 B.R. at 337 (Bankr.S.D.N.Y.1983) (same); *see also Danning*, 922 F.2d at 549 n. 3 (collecting cases from various courts).

*role as a conduit.* To ascertain whether A & A was more than a mere conduit of the funds transferred to American Home, we examine the transfers themselves, among Finley Kumble, the excess insurers, and American Home.

No doubt, A & A's relationship with Finley Kumble transcended that of a mere courier. However, once the decision had been made—however it was made—to cancel the primary and excess policies, and to transfer the premiums to American Home to purchase the discovery tail, A & A's role in the transfers of funds was that of a mere conduit. As Finley Kumble's agent—not American Home's—A & A had no discretion or authority to do anything else but transmit the money, which is just what it did. Moreover, it is uncontested that the transfer of premium funds is an ordinary and routine financial transaction for an agency in A & A's industry, and that the transfer itself was performed here by A & A in a regular and unexceptionable way. Despite the existence of a more complex relationship, there can be no question that at that point A & A was acting only to channel the funds from the premium returns and Finley Kumble to American Home. *See, e.g., Danning,* 922 F.2d at 549 (even though funds were eventually used to purchase stock in defendant's name, defendant who was under a contractual duty to dispose of funds in a particular way was not an initial transferee); *Nordberg,* 848 F.2d at 1200 (when at time of transfer bank received money for deposit to customer's account, bank was not initial transferee even if money eventually is used to reduce customer's indebtedness to bank); *Bonded Financial,* 838 F.2d at 894.

Our inquiry is simplified because A & A received no commission for its transfer of funds to American Home. It does appear, however, that A & A had the power to take a commission, and that is potentially significant. At the same time, many ordinary and routine transactions entail service fees that may be debited against the funds as they pass from hand to hand. *See, e.g., Hooker Atlanta,* 155 B.R. at 335, 340 (broker who deducted commission from escrowed funds, not an initial transferee); *Salomon,* 59 B.R. at 874 n. 2 (steamship company entitled to fee as collection agent, not an initial transferee). We need not decide whether A & A would have been an initial transferee as to the amount of any commission.

■ For present purposes, we need hold only that a commercial entity that, in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in respect of the challenged transaction, is not an initial transferee within the meaning of § 550(a)(1).

In light of our resolution of this issue, it is unnecessary to address any of Christy's other arguments with respect to the district court's disposition and analysis.

## CONCLUSION

We affirm the judgment of the district court granting summary judgment to A & A.