In re MAINELY PAYROLL, INC., Clifford J. Levesque, and Dorothy Levesque, Debtors.

P.J. Perrino, Jr., Trustee, Plaintiff,

v.

Salem, Inc., et al., Defendants.

Bankruptcy Nos. 96–10533, 96–10542, 96–10543.
Adversary No. 98–1049.

United States Bankruptcy Court, D. Maine.

May 4, 1999.

Rufus E. Brown, Portland, Maine, for plaintiff.

Louis H. Kornreich, James R. Wholly, Bangor, Maine, for Salem, Inc., defendant.

### Memorandum of Decision

JAMES B. HAINES, Jr., Chief Judge.

Submitted for decision on a stipulated record is the trustee's action to recover a fraudulent transfer from Salem, Inc. Because I conclude that Salem is an "immediate or mediate transferee" of the initial transferee and because Salem took the property it received for value, in good faith, and without knowledge that the transfer was voidable, judgment will enter in its favor.[1]

### Background

*A. Procedural Background*

The trustee filed his complaint against Salem on May 21, 1998. By compromise or dismissal, he has disposed of claims

---

**1.** This memorandum sets forth my findings of fact and conclusions of law pursuant to Fed. R.Bankr.P. 7052 and Fed.R.Civ.P. 52. Unless otherwise indicated, references to statutory sections are to the Bankruptcy Reform Act of 1978 (the "Bankruptcy Code" or the "Code"), as amended, 11 U.S.C. § 101 *et seq.*

against all defendants other than Salem.[2] Invoking Code § 548 and § 550, the trustee seeks to recover $31,084.06.

## B. Facts

Rather than spinning my own factual narrative, I will set forth the parties' concise stipulation *verbatim:*

1. Mainely Payroll, Inc. ("MPI") was a payroll service located in Augusta, Maine, servicing businesses located in the Greater Augusta area before it ceased operations on or about May 6, 1996.

2. Clifford Levesque ("Levesque") was a stockholder, director, and the president of MPI. He controlled and managed MPI exclusively by himself.

3. MPI's normal method of doing business was to calculate a client's payroll expenses from information supplied by the client and then collect from its clients the funds necessary to cover such expenses.

4. MPI would deposit the funds collected from its clients into a bank account maintained by MPI first at Casco Northern Bank, which later merged into Key Bank, and then in 1996 at Fleet Bank of Maine (the "MPI payroll account"). The MPI payroll account maintained at Fleet was Account No. 9355162958.

5. The MPI payroll account was maintained separately from the company's operating account, but it was not segregated by client. All client funds were commingled with each other and drawn upon by MPI in the course of its payroll business operations. From the MPI payroll account, MPI would write payroll checks for its payroll clients and promised to accumulate and then deposit with the appropriate government agencies amounts withheld for state and federal taxes and unemployment insurance.

6. Beginning in the Fall of 1993 until shortly before the filing of bankruptcy, Levesque used the MPI payroll account as if it were his personal banking account. He gave no regard to the separate legal status of MPI as a corporation except to use the corporation to obtain payroll deposits from MPI customers. He used MPI's client deposits for his own needs when desired. He never treated the sums taken from the payroll client account as a loan. No note was executed, no promise to repay was given, no interest was recorded. He simply disregarded the corporate entity and treated the client fund account as if he owned it.

7. Salem is a Connecticut corporation with a principal place of business at Naugatuck, Connecticut, doing business as an automobile dealership.

8. On or about March 25, 1996, at its place of business in Naugatuck, Connecticut, Salem sold a 1996 Chevrolet Tahoe to Bond Brook Motors, an automobile dealership located in Augusta[,] Maine[,] in which Levesque's son, Michael Levesque was a principal. A true copy of the invoice for the sale is attached hereto as Exhibit A.

9. The invoice was paid for with a cashier's check in the amount of $31,084.06 drawn on Fleet dated March 25, 1996, showing Bond Brook Motors as the Remitter. A true copy of the cashier's check is attached hereto as Exhibit B.

10. The cashier's check was delivered to Salem on or about March 26, 1996, at which time the 1996 Chevrolet Tahoe was picked up from Salem.

11. The cashier's check was paid for by a charge to the MPI payroll account upon instructions from Levesque on or about March 25, 1996. A true copy of the Debit Memo evidencing the charge is attached hereto as Exhibit C.

12. Salem accepted the cashier's check in payment of the sale of the 1996 Chev-

---

**2.** The complaint named four other parties defendant and alleged different causes of action, based on different transactions, against each. Joinder went unquestioned.

rolet Tahoe to Bond Brook Motors for value, in good faith, without knowledge of the voidability of the transfer.

13. Salem had no business relationship with Levesque, Michael Levesque or MPI. Neither MPI nor Levesque received any value in exchange for the payment of Salem's invoice.

14. Levesque was not an owner, officer or principal of Bond Brook Motors.

15. In March, 1996 both MPI and Levesque were insolvent.

16. On or about May 23, 1996, both MPI and Levesque filed petitions for bankruptcy under Chapter 7 of the Bankruptcy Code.

17. On December 10, 1997, Clifford Levesque and Michael Levesque pleaded guilty to federal criminal charges arising out of their involvement with MPI based on facts outlined in a Prosecution Version that each stipulated to and both are now serving federal prison sentences. A true copy of the Prosecution Version for Clifford Levesque is attached hereto as Exhibit D and the Prosecution Version for Michael Levesque is attached hereto as Exhibit E. The parties do not stipulate to the truth of the matters asserted in either Prosecution Version.

(Stipulation, Court Doc. No. 12.) (Exhibits excluded.)

██ Of course, I may appropriately find facts based on reasonable inferences drawn from the stipulated record. *See, e.g., Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.),* 132 F.3d 104, 107–08 (1st Cir.1997). The stipulation establishes all the material facts except a very few. The balance,

recited in the course of the following discussion, are products of elementary inference.

### Discussion

#### A. The Crux of the Controversy

The trustee asserts that Salem received $31,084.06 of MPI's money, while MPI was insolvent, in a transaction that bestowed no benefit whatsoever on MPI. Per Code-prescribed priorities, he argues that the funds should be returned to the bankruptcy estate to be divvied among MPI's creditors. Section 548(a) provides the substantive underpinning for the trustee's theory:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

§ 548(a)(1).[3]

██ The stipulation establishes all elements of a voidable, fraudulent transfer.[4]

---

3. The section enumerates alternative grounds for recovery, but they are not germane to today's decision.

4. The Code defines "transfer": "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity

of redemption[.]" § 101(54). The definition is seemingly all encompassing. However, as will become clear below, courts construing § 550(a)(1) employ a more restrictive notion of "transfer" when considering who is an "initial transferee" in the fraudulent conveyance context. They focus on the transferee's relationship to the property, rather than the debtor's.

MPI's property ($31,084.06),[5] was transferred to Salem, within one year of MPI's voluntary petition, while MPI was insolvent, and MPI received less than reasonably equivalent value (nothing) in return.

The extent of a fraudulent transfer recipient's liability, and whether defenses are available to it, are set forth in § 550. Insofar as pertinent, it states:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

§ 550(a)–(b).[6]

Having taken possession of the cashier's check and negotiated it, Salem is a "transferee" of MPI's money. The only question relates to Salem's status as either the "initial transferee" of the money, § 550(a)(1), or an "immediate or mediate transferee of [the] initial transferee." § 550(a)(2).

■ If Salem were the "initial transferee" of MPI's money, its liability would be strict. As to the initial transferee, it makes no difference whether it gave value, acted in good faith, or was ignorant of the transfer's voidable character. *See Christy v. Alexander & Alexander of New York Inc. (In re Finley)*, 130 F.3d 52, 57 (2d Cir.1997); *Rupp v. Markgraf*, 95 F.3d 936, 938 (10th Cir.1996); *O'Donnell v. Royal Bus. Group, Inc. (In re Oxford Homes, Inc.)*, 180 B.R. 1, 12 (Bankr.D.Me.1995). Neither innocence in action nor unfairness in result is a defense.[7] However, as the

---

5. As one of its arguments, Salem has advanced the theory that since the funds at issue came from MPI's client payroll account, they were not MPI's property or property in which MPI held an interest. Salem cites *Begier v. I.R.S.*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). However, there is a distinction of "paramount importance," *Wyle v. S & S Credit Co. (In re Hamilton Taft & Co.)*, 53 F.3d 285, 289 (9th Cir.1995), between the facts of *Begier* and the facts here. MPI "is a third party to whom trust-fund taxes were conveyed as consideration for a contract" not a payee of its own trust-fund obligations as in *Begier. In re Hamilton Taft & Co.*, 53 F.3d at 289. "Under normal principles of trusts, if a trustee transfers trust property to a third party, the third party holds that property free of trust unless the trustee committed a breach of trust in conveying the property." *Id.* at 288. Like the debtor in *In re Hamilton Taft & Co.*, MPI

extensively commingled all of the funds it received and treated the funds as its own assets, using them to pay its operating expenses and investing the funds for its own benefit. Therefore, under ordinary principles of trust, [MPI] did not hold the funds in

trust. Thus, the funds were property of the debtor....

*Id.*

6. The balance of § 550 protects certain transferees in situations where the transfer benefitted an insider (an anti-*DePrizio* provision), *see* § 550(c); *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186 (7th Cir.1989) (V.N. Deprizio Construction Company bankruptcy case overruled by § 550(c)); limits the trustee to a single satisfaction of his fraudulent transfer claim, *see* § 550(d); provides lien protection to good faith transferees who parted with value to improve property recovered or in whose hands the property appreciated, *see* § 550(e); and sets the limitations period for avoidance actions. *See* § 550(f).

7. The statute leaves no room to fashion a remedy that treats the initial transferee "equitably" under the circumstances of any given case. *See Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties Ltd.)*, 99 F.3d 151, 157 (4th Cir.1996) ("[D]ecisions as to who should bear the loss incurred by a post-petition transfer are made in the Code."); *Rupp*, 95 F.3d at 944 ("Congress has made its

trustee concedes, if Salem were not the initial transferee it could invoke § 550(b)'s defenses (*i.e.*, value, good faith and ignorance of avoidability) to defeat recovery. *See generally* 3 Hon. William L. Norton, Jr., et al., *Norton Bankruptcy Law and Practice 2d* § 60:5 (1997 & Supp.1999).

■ Salem contends that Bond Brook Motors, the entity listed as remitter on the cashier's check and the party to whom Salem sold the vehicle, is MPI's initial transferee. The trustee contends that Bond Brook was not MPI's initial transferee; he asserts that Salem was.[8]

*B. Identifying the Initial Transferee*

■ The constituents of a transfer subject to avoidance under the Code and the

characteristics of an initial transferee are determined by federal law. *See Barnhill v. Johnson*, 503 U.S. 393, 397, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). Here, those determinations require examination of what property interests MPI, Fleet, Bond Brook, and Salem obtained in the course of the disputed transfer. Their interests are defined by state law. *See id.* at 398, 112 S.Ct. 1386; *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *see also Vasquez v. Mora (In re Mora)*, 218 B.R. 71, 74 (9th Cir. BAP 1998) (examining the transfer of a cashier's check, looking to state law).

own judgment of who should bear the risk of loss under [sic] these situations when it enacted Section 550, and [the court is] bound to accept that judgment."); *Bonded Fin. Servs., Inc. v. European American Bank*, 838 F.2d 890, 894–95 (7th Cir.1988) (rejecting an approach that would treat any entity that handles the debtor's assets as an initial transferee and then bail out the deserving through an unwarranted extension of equity); *Richardson v. F.D.I.C. (In re M. Blackburn Mitchell Inc.)*, 164 B.R. 117, 123 (Bankr.N.D.Cal.1994) ("[T]he court declines to manipulate the application of the Code [§ 550] in order to achieve what some may contend is a preferred result."); *id.* at 125 ("The Court concludes that it is irrelevant as a matter of law that the [defendant] did not have knowledge, or reason to believe, that the funds it received flowed from Debtor's account. Under § 550 of the Bankruptcy Code, it is crystal clear that even the 'innocent' initial transferee is liable for the fraudulently transferred funds."); *see also In re Finley*, 130 F.3d at 56 (describing practice of some courts that regard "the first pair of hands to touch the property [as] the initial transferee," and then go on to "separate sheep from goats" in an attempt to work equity); *see generally* Kenneth P. Coleman, *Conduits, Good Faith, and the Recovery of Preferences and Fraudulent Transfers Under Bankruptcy Code Section 550*, 114 Banking L.J. 375 (1997) (analyzing *Rupp* ).

8. Whatever the answer to today's puzzle, the trustee could seek § 550(a)(1) recovery from Bond Brook. Even if Salem were found to be the initial transferee, Bond Brook plainly was the party "for whose benefit" the transfer at issue was made. § 550(a)(1). The trustee is

entitled to only a single satisfaction of his claim, *see* § 550(d), but the statute provides that fraudulent transfer beneficiaries and transferees can each be liable in their own right. *See* § 550(a)–(b).

Section 550(a)(1)'s provision for recovery against each of two entities has sparked some discussion as to whether one party can play both roles: intended beneficiary *and* initial transferee. Some courts, relying upon language in *Bonded Financial Services, Inc.*, have concluded that the two identities are mutually exclusive. *See, e.g., In re Southeast Hotel Properties Ltd.*, 99 F.3d at 155; *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544, 548–49 (9th Cir.1991); *General Electric Capital Auto Lease, Inc v. Broach (In re Lucas Dallas, Inc.)* 185 B.R. 801, 809 (9th Cir. BAP 1995); *In re Blackburn Mitchell Inc.*, 164 B.R. at 130 & n. 18. That proposition, however, is not writ in stone. *See In re Chase & Sanborn Corp.*, 904 F.2d at 597 n. 22 (describing the *Bonded Financial Services, Inc.* conclusion as "thoughtful and quite possibly correct" but not deciding whether the initial transferee might also be the benefitted entity).

The debate over-complicates the issues and is often beside the point. One need only look at a simple, two-party transaction (*e.g.*, insolvent debtor gives $500 to his nephew) to see that one may be both the intended beneficiary and the initial transferee of a voidable, fraudulent transfer. Bond Brook's status, and potential liability, are not before me today. However, the facts seem to present an instance in which Bond Brook may well have been both MPI's initial transferee *and* the transfer's beneficiary.

### 1. Section 550(a)(1) Dominion Test for Initial Transferee

■ Though the First Circuit has yet to analyze initial transferee status under § 550(a)(1), most courts of appeal have done so. *See In re Finley*, 130 F.3d 52 (2nd Cir.1997); *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195 (9th Cir.1997); *Cullen Center Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411 (5th Cir.1997); *In re Southeast Hotel Properties Ltd.*, 99 F.3d 151 (4th Cir.1996); *Rupp*, 95 F.3d 936 (10th Cir. 1996); *Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortgage Co.)*, 33 F.3d 42 (10th Cir.1994); *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712 (6th Cir.1992); *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588 (11th Cir.1990); *Bonded Fin. Servs., Inc.*, 838 F.2d 890 (7th Cir.1988). Across-the-board, the Seventh Circuit's seminal definition of "transferee" in *Bonded Financial Services, Inc.* holds sway:

> Although the Bankruptcy Code does not define "transferee", and there is no legislative history on the point, we think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes.

838 F.2d at 893. *Accord In re Finley*, 130 F.3d at 57–58; *In re Southeast Hotel Properties Ltd.*, 99 F.3d at 154–56; *Rupp*, 95 F.3d at 938–39; *In re First Sec. Mortgage Co.*, 33 F.3d at 43–44; *Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir.1993); *In re Bullion Reserve of North America*, 922 F.2d at 549; *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir.1988); *see also In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d at 722 (Sixth Circuit discussing and seemingly applying the *Bonded Financial Services, Inc.* test); *see also, e.g., Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 195 B.R. 455, 461 (N.D.Cal.1996); *Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 151 B.R. 1012, 1021 (Bankr.N.D.Cal.1993) *aff'd* 195 B.R. 455 (N.D.Cal.1996).

There are four parties with noteworthy affiliations to the MPI cashier's check. The question, quite simply, is which entity first had "dominion" over the cashier's check after MPI parted with its interest; which party first had "the right to put the money to [its] own purposes." *Bonded Fin. Servs., Inc.*, 838 F.2d at 893. *See also In re Chase & Sanborn Corp.*, 848 F.2d at 1199 (courts attempting to identify the initial transferee must look at the "entire transaction," rather than at any step in isolation); *In re M. Blackburn Mitchell Inc.*, 164 B.R. at 126 ("The Court believes that the proper focus when analyzing who is a transferee[ ] is on the *flow of funds.*").

#### a. Conduit Theory: One and Two Step Transactions

■ Courts examining multi-party transactions (like the one before me) parse them into their constituent "steps" to ascertain each point where property has come to rest under the dominion of a transferee. In doing so, they have invoked the "mere conduit" test to exclude from transferee status (and potential liability) entities who have received and handled a debtor's property but who have not exercised dominion over it. *See In re Finley*, 130 F.3d at 57–59; *In re Southeast Hotel Properties Ltd.*, 99 F.3d at 154–55; *Rupp*, 95 F.3d at 941; *In re Chase & Sanborn Corp.*, 904 F.2d at 598–600; *In re Chase & Sanborn Corp.*, 848 F.2d at 1199–1200; *Leonard v. First Commercial Mortgage Co. (In re Circuit Alliance, Inc.)*, 228 B.R. 225, 232–33 (Bankr.D.Minn.1998); *Machinery and Steel Serv., Inc. v. Dalton (In re Machinery and Steel Serv., Inc.)*, 112 B.R. 478, 480 (Bankr.D.Mass.1990). Conduits are "financial intermediaries and couriers," as *Bonded Financial Services, Inc.* explained, *e.g.*, the Federal Reserve System receiving a wire transfer or an armored car company carrying a debtor's "valuables or specie." *Bonded Fin. Servs., Inc.*, 838 F.2d at 893. *See also In re*

*Circuit Alliance, Inc.*, 228 B.R. at 233 (identifying banks, escrow and title companies, securities or investment brokers, and attorneys holding client monies in escrow, trust, or on deposit as " 'mere conduits' "); *see, e.g., In re First Sec. Mortgage Co.*, 33 F.3d at 44 (describing a bank receiving funds from a customer for deposit into a customer's trust account as a "financial intermediary").

*Bonded Financial Services, Inc.* involved a debtor that sent the defendant bank a $200,000 check, payable to the bank, with instructions to deposit the funds in the debtor's principal's personal account. Shortly thereafter the principal instructed the bank to debit his account $200,000 and to apply the funds to a debt owed the bank by another of the principal's business enterprises. Finding that the principal had the ability to put the funds to whatever use he desired before he transferred them to the bank to pay down the loan, the court characterized the intercourse as a "two-step transaction" (corporation to principal; principal to bank), 838 F.2d at 894, and identified the first step's conclusion as the point where § 550(a) initial transferee liability adheres. The *Bonded Financial Services, Inc.* court distinguished a hypothetical "one-step transaction," in which the debtor transferred its funds to a bank with instructions to apply them directly to a third party's obligation. *See id.* at 892, 894.

In *Rupp* the debtor corporation purchased a cashier's check made payable to its principal's creditors, with the debtor corporation listed as remitter. The bank mailed the check to the debtor's principal, who then delivered it to his creditors. Despite the principal's pre-transfer control over the debtor and his role in delivering the cashier's check to the payees, the principal had no legal right to or control over funds, before or after the issuance of the cashier's check. 95 F.3d at 941. He "was,

at most, a mere courier." *Id.* at 940. Despite the principal's involvement, the funds flowed uninterruptedly from the debtor to its principal's creditors; the court concluded that it had before it a scenario that "fit into the category of one-step transactions." *Id.*

### *2. Property Interests Under State Law*

 To sort the conduits from the transferees, and to identify the initial transferee, I must examine what property interests each of the entities involved in the transaction had vis-a-vis MPI's cashier's check under state law. Maine's version of the Uniform Commercial Code's Article 3 governs my analysis because it establishes the parties' rights to such an instrument. *See* Me.Rev.Stat.Ann. tit. 11, § 3–1101–1605 (West 1995); *see also Barnhill*, 503 U.S. at 398 & n. 5, 112 S.Ct. 1386 (analyzing the time of a check's transfer under Bankruptcy Code § 547 "under the rubric" of the U.C.C., the state having adopted a version of the U.C.C. that does not materially differ from the uniform law).[9]

Starting at the beginning, Fleet Bank was the drawer, *see* Me.Rev.Stat.Ann. tit. 11, § 3–1103(1)(c) (drawer is "a person who signs or is identified in a draft as a person ordering payment"); drawee, *see id.* § 3–1103(1)(b) (drawee is "a person ordered in a draft to make payment"), and issuer, *see id.* § 3–1105(3)("(A) maker or drawer of an instrument."), of the cashier's check. *See id.* § 3–1104(7) (cashier check is "a draft with respect to which the drawer and the drawee are the same bank or branches of the same bank").

Per MPI's request, Fleet "issued" the cashier's check to MPI: it made "the first delivery of [the] instrument [as] the ... drawer, whether to a holder or a nonholder, for the purpose of giving rights on the instrument to any person." *Id.* § 3–1105(1). *See also id.* cmt. 1 (observing that

---

9. Maine's adaptation of Article 3 is unexceptional; thus, I, too, may draw on the rubric of

U.C.C. Article 3 analysis.

the former version of this statute defined issue as "the first delivery to a 'holder or remitter'" and that the current version defines issue "more broadly to include the first delivery to anyone by the drawer ... for the purpose of giving rights to anyone on the instrument"); *id.* § 3–1201 cmt. 2 (where a buyer of goods purchases a cashier's check, the check is issued when delivered to the buyer, whether or not it is payable to the buyer or seller, with citation to § 3–[1]105(a)).

When MPI purchased the check and Fleet delivered it to MPI, MPI was a "remitter" under Article 3: "a person who purchases an instrument from its issuer if the instrument is payable to an identified person other than the purchaser." *Id.* § 3–1103(1)(k). At this point MPI took "rights on the instrument." *Id.* § 3–1105(1).[10]

Though not a "holder" of the instrument, MPI was entitled to enforce it, to make Fleet, as issuer, pay the instrument. *See* Me.Rev.Stat.Ann. Tit. 11, § 3–1301(2) (persons entitled to enforce include a "nonholder in possession of the instrument who

has the rights of a holder"); *id.* § 3–1412 ("The issuer of a ... cashier's check ... is obliged to pay the instrument ... to a person entitled to enforce the instrument...."); *see also id.* § 1–201(20) (defining holder).[11]

In similar circumstances, the Ninth Circuit's Bankruptcy Appellate Panel came to the same conclusion after a thorough review of the relative rights of issuer, remitter, and payee to a cashier's check under the U.C.C.: "Although a purchaser cannot stop payment of the cashier's check, he or she could return the cashier's check or seek to have it canceled [sic] as long as it is in his or her possession. Therefore, until delivery, the purchaser's property rights in the cashier's check are not transferred to the payee/holder." *Hall–Mark Electronics Corp v. Sims (In re Lee),* 179 B.R. 149, 161 (9th Cir. BAP 1995) *aff'd* 108 F.3d 239 (9th Cir.1997). *See also* Maggs, *supra,* at 647–49, 656–57 (noting the circularity of § 3–1301, determining that the section indicates that nonholders can have the rights of a holder; that remitters logically stand, along with assignees, in this category as holders with the right to en-

---

**10.** With respect to remitter transactions, Article 3 is not a model of clarity. Indeed, remitters are in somewhat of a U.C.C. twilight zone. Their visage fades in and out of focus depending on the facts of a dispute and the applicability of Article 3's provisions. *See generally* Gregory E. Maggs, *Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions,* 36 B.C.L.Rev. 619 (1995).

**11.** This determination in not beyond dispute. However, it is the most coherent conclusion given the applicable sections of Article 3 and the parties' intentions.

Additionally, two notable reverberations would emanate from a contrary conclusion. First, as Professor Maggs asserts, since transferring the instrument to the payee is an inherent (though not inevitable) object of the remitter, to conclude that a remitter does not have the right to enforce would mean that each time a remitter transfers the instrument it violates Article 3 transfer warrantees. *See id.* § 3–1416(a) ("A person who transfers an instrument for consideration shall warrant to the transferee ... that [t]he warranter is a

person entitled to enforce the instrument[.]"); Maggs, *supra,* at 649–50.

Second, to conclude that a remitter purchasing a cashier's check made out to a third party does not have the right to enforce the instrument would significantly undercut the general rule that, as issuers of such checks, banks operate as "mere conduits." That is, if the purchaser of the cashier's check parts company with its interest in its funds at the time that the check is drawn, and has no right to enforce the check thereafter (and if, in the absence of delivery to the payee, the bank reaps a windfall), the bank might well be viewed as the initial transferee. (The payee takes no interest in the instrument until it receives delivery of the instrument. *See* Me. Rev.Stat.Ann. tit. 11, § 3–1201.)

One comment to Article 3 does cast a pall on the conclusion that a remitter has the right to enforce the instrument up until the time of the negotiation to the seller. A comment to § 3–1312 states that § 3–[1]309 does not apply to remitters because it applies "only to a person entitled to enforce the check." *Id.* § 3–1312 cmt. 1. *See also* Maggs, *supra,* at 659 (arguing that courts "should disagree with this comment").

force); *see, e.g., Rupp,* 95 F.3d at 940 (suggesting that if the debtor's principal had been remitter of the cashier's check he could have personally accessed the funds the check represented); *In re Mora,* 218 B.R. at 75 (holding that a remitter retains an interest in a cashier's check up until delivery (the payee's physical possession), not when it is placed in the mail, stating that pursuant to postal regulations the debtor/remitter could reclaim the mail until it was delivered, analyzing § 549(a)); *In re Richmond Produce Co., Inc.,* 151 B.R. at 1017 ("California law clearly supports the view that the purchaser has a property interest in a cashier's check before it is delivered."); *accord In re Richmond Produce Co., Inc.,* 195 B.R. at 462 & n. 4. As remitter, MPI was also the "owner" of the check, even though it was "not a party to the check." Me.Rev.Stat.Ann. tit. 11, § 3–1201 cmt. 2.[12]

MPI then delivered the check to Bond Brook, the entity named as a remitter on the face of the check. *See id.* § 1–201(14) (delivery of instruments defined for all articles of the U.C.C. as "voluntary transfer of possession").[13] That delivery was a "transfer" of the instrument, the significance of which is also illuminated by Article 3:

**Transfer of instrument; rights acquired by transfer**

(1) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(2) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument. . . .

*Id.* § 3–1203(1)–(2).[14] Delivery was not a "negotiation" of the cashier's check to Bond Brook by MPI because, as a non-payee, Bond Brook did not become a "holder" of the instrument as a conse-

---

**12.** Article 3 recognizes that parties may acquire state law interests in negotiable instruments outside the rubric of the U.C.C. defined state property rights:

> Although the transfer of an instrument might mean in a particular case that title to the instrument passes to the transferee, that result does not follow in all cases. The right to enforce an instrument and ownership of the instrument are two different concepts. . . . Ownership rights in instruments may be determined by principles of the law of property, independent of Article 3, which do not depend upon whether the instrument was transferred under Section 3–203.

*Id.* § 3–1203 cmt. 1. *cf. id.* § 3–1201 cmt. 2 (remitter is owner of the check until "delivery" to seller). Although other property law principles may not be determinative here, I note that MPI's delivery of the check to Bond Brook, together with naming Bond Brook as remitter, points to a conclusion consistent with that to which U.C.C. principles point me. *See id.* § 1–103 (provisions of the U.C.C. shall be supplemented by applicable general principles of law); *see also infra* note 14.

**13.** The trustee argues that there is no evidence demonstrating that the check was ever delivered to Bond Brook. I agree that the parties have not stipulated to the point expressly. Neither is there an express stipulation that MPI delivered the check to Salem, bypassing Bond Brook entirely. On this record, it is more likely than not that MPI provided the check to Bond Brook and that Bond Brook delivered it to Salem when Salem proffered a car that was acceptable to Bond Brook in return. (Stipulation ¶ 8–14.)

**14.** In a sense, MPI's instructions to Fleet to name Bond Brook as the remitter was the initial step in transferring its interest to Bond Brook. The naming of a remitter other than the purchaser of the instrument is not addressed in Article 3. One court, determining that an issuer's failure to fill in the remitter line on a cashier's check did not support a claim of negligence, somewhat perfunctorily concluded that "filling in the remitter line on a cashier's check is akin to the filling in of a memo line on a personal check; helpful, but not required, and of no legal effect." *Spears Carpet Mills, Inc. v. Century Nat'l Bank of New Orleans (In re Spears Carpet Mills, Inc.),* 86 B.R. 985, 993 (Bankr.W.D.Ark.1987). Whatever measure of independent legal significance naming Bond Brook as remitter may have had, read in context with the entire transaction, it does demonstrate MPI's "purpose of giving [Bond Brooks] the right to enforce the instrument." Me.Rev.Stat.Ann. tit. 11, § 3–1203(1).

quence. *See id.* § 3–1201(1) (defining negotiation as "a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder"); *id.* § 1–201 (defining a holder of a negotiable instrument as "the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession"). However, even though Bond Brook was not a holder, it received MPI's "rights" on the instrument, *id.* § 3–1105(1), and was entitled to "enforce" the instrument. *Id.* § 3–1301(2). *See also* Maggs, *supra,* at 647–49, 656–57 (arguing that remitters can transfer the right to enforce).[15]

15. As named remitter and as successor to MPI's interests in the instrument, Bond Brook also succeeded to MPI's § 3–1312 rights to a claim in the event of loss, destruction or theft. This conclusion is consistent with the allocation of risk underlying that section of the Commercial Code. The comment to § 3–1312 states:

> Limitation to an original party or remitter gives the obligated bank the ability to determine, at the time it becomes obligated on the check, the identity of the person or persons who can assert a claim with respect to the check. The bank is not faced with having to determine the rights of some person who was not a party to the check at that time or with whom the bank had not dealt.

Me.Rev.Stat.Ann. tit 11, § 3–1312 cmt 2. Fleet dealt directly with MPI as purchaser of the check and in issuing the check filled in the line identifying Bond Brook as remitter. Thus, under the principles outlined above, both MPI and Bond Brook would have the right to make a claim pursuant to § 3–1312. Between the two, which party had claimant rights under § 3–1312 would be determined according to who had rights to the instrument at the time of loss, which would depend on whether the transfer from MPI to Bond Brook had yet occurred. *See* discussion *supra.*

16. There can be no serious argument that either Clifford Levesque or Fleet was the initial transferee. Principals of corporate debtors who direct the corporation's fraudulent transfers to third parties, but who do not actually receive the funds transferred, are not initial transferees. *See, e.g., In re Video Depot, Ltd.,* 127 F.3d at 1198–1200 (corporate principal who directed the purchase of a cashier's

Bond Brook then physically delivered the cashier's check to Salem, a step constituting a "transfer" *and* "negotiation." Me.Rev.Stat.Ann. tit. 11, § 1–201(14) (delivery); *id.* 3–203(1) (transfer); *id.* § 3–1201(1) (negotiation). Salem became the "holder" of the instrument, as the identified payee in possession. *See id.* § 1–201. Salem obtained the right to the $31,084.06. At that point, Bond Brook's rights to the instrument extinguished. *See In re Richmond Produce Co., Inc.,* 151 B.R. at 1017.

### 3. The Buck Stopped With Bond Brook

I conclude that Bond Brook was the initial transferee of the MPI cashier's check.[16] After MPI, it was the first

check by the debtor corporation and caused the check's delivery to a personal creditor, but was not the remitter, did not have independent control over the funds as the cashier's check was "earmarked" for the payee); *In re M. Blackburn Mitchell Inc.,* 164 B.R. at 127–31 & n. 20 (corporate principal who directed transfer was not the initial transferee, suggesting a different outcome if the transfer had resulted in a co-mingling of the debtor's funds in the principal's personal account). *Compare In re Richmond Produce Co., Inc.,* 151 B.R. at 1021 (corporate principal "exercised complete control over the transaction," when he picked up a cashier's check from the issuer, was named as remitter, delivered it to the payee, and purchased a certificate of deposit in his own name with the proceeds). Levesque did no more than direct the transfer of the MPI funds to Bond Brook.

Fleet functioned as a conduit. It merely processed the transaction on its customer's order; it had no control over the application of the funds and it received no benefit from their disposition. *See In re Chase & Sanborn Corp.,* 848 F.2d at 1200 ("When banks receive money for the sole purpose of depositing it into a customer's account ... the bank never has actual control of the funds and is not a section 550 initial transferee."); *see, e.g., id.* at 1200–01 (bank's honoring of check on debtor's overdrawn account did not make it an initial transferee of the money debtor subsequently wired to cover the check, concluding that there was no "real debt" owed by the debtor to the defendant—even though overdrafts have "traditionally been considered debts"—because the "transaction was virtually simultaneous" and the defendant bank at-

entity to have dominion over the funds. It had the "right to put the money to [it's] own purposes." *Bonded Fin. Servs., Inc.*, 838 F.2d at 893. It exercised this right when it negotiated the check to Salem and took delivery of the vehicle in exchange.

As outlined above, Bond Brook—transferee of MPI's rights in the cashier's check, named remitter, and the party in possession of the instrument—had the right to enforce the $31,084.06 cashier's check up until the time it negotiated the check to Salem.[17] No other entity had the right to negotiate the check to Salem or to make Fleet pay the instrument. *See* Me. Rev.Stat.Ann. tit. 11, § 3–1420 (an issuer or payee cannot bring an action for conversion unless it received delivery of the instrument).[18] Bond Brook took the interest in the cashier's check transferred to it by MPI along with the ability to put it to its own purpose, the purchase of a 1996 Chevrolet Tahoe.[19]

■ I also observe that even though MPI was engaged in sundry forms of monkey business, Bond Brook's rights in the

<hr/>

tained assurance that the cover money was being transferred when it honored the check, thus indicating it did not intend to extend a loan); *Bonded Fin. Servs., Inc.*, 838 F.2d at 892–93 (bank that received funds from the debtor and deposited them into the debtor's principal's account as directed was only a conduit, even though the funds were subsequently paid to the bank to reduce the principal's loan obligation to the bank).

**17.** It matters little whether Bond Brook could have purchased "lottery tickets or uranium stocks" while it held the check. *Bonded Fin. Servs., Inc.*, 838 F.2d at 894. Too much has been made of this phrase by subsequent courts applying *Bonded Financial Services, Inc.*'s teaching to cases involving "mere conduits." There is no indication that the Seventh Circuit intended to establish utterly unrestrained dominion over property as the essential element of "transferee" status. Indeed, the transferee *Bonded Financial Services, Inc.* scrutinized was free to take the proceeds of the debtor's check and use them for any purpose. But it does not follow that the transfer of a not fully fungible, delimited property interest could not be avoided, and the asset recovered via §§ 548 and 550(a)(1). For instance, a trustee could recover the transferred interest in a life tenancy, despite the constraints on use and limits on alienation that adhere to that interest. Even if all MPI could do with the check was to hold it or transfer it to Salem, it fully transferred that interest to Bond Brook. *Bonded Financial Services, Inc.*'s teaching is that the initial transferee is one with the right to put the property to its own purposes. Little heed should be paid to the court's off-the-cuff remark on how eccentric and uninhibited the purposes could have been in the case before it.

**18.** My analysis aligns with Supreme Court jurisprudence on the meaning of "transfer." In *Barnhill* the Court determined that a transfer of an ordinary check occurs at the date of honor, not at the date the check is delivered to the payee. 503 U.S. at 400, 112 S.Ct. 1386. Focusing on the language of Bankruptcy Code § 101(54), the Court reasoned that the bank's honoring of the check was a prerequisite to " 'the disposing . . . of property or . . . an interest in property.' " *Id.* (quoting § 101(54)). The Court twice stressed that the transfer occurred at foreclosure of the debtor's ability to control the funds. *See id.* at 400–01, 112 S.Ct. 1386 (noting that the honoring of the check "left the debtor in the position that it would have occupied if it had withdrawn cash from its account and handed it over to petitioner," stating that the debtor retained the right to stop payment on the check "until the moment of honor"). Here, MPI transferred the cashiers check to Bond Brook and parted with its interest *in toto*. Thereafter, until delivered to Salem, Bond Brook could control the check.

**19.** Bond Brook obtained a positive transferee "benefit" when it received the check from MPI, "a valuable right," *Bonded Fin. Servs., Inc.*, 838 F.2d at 893, that enabled Bond Brook to purchase a vehicle from Salem to add to Bond Brook's inventory. It received something "it could call its own." *Id. See also In re Presidential Airways, Inc.*, 228 B.R. 594, 601 (Bankr.E.D.Va.1999) (identifying transferee benefit as one of the indicia distinguishing an initial transferee form a conduit); *In re Machinery and Steel Serv., Inc.*, 112 B.R. at 479–80 (same).

This benefit is distinguishable from the more mundane "benefit" of doing business that a commercial entity, such as a banking or brokerage enterprise, enjoys when handling business transactions for its customers. *See In re Presidential Airways, Inc.*, 228 B.R. at 601 (fees for services as an insurance broker not the sort of benefit that is evidence of initial transferee status).

check and thus its exercise of "dominion" was *"legal,"* not "merely physical." *In re Southeast Hotel Properties Ltd.,* 99 F.3d at 156. *See also In re Video Depot, Ltd.,* 127 F.3d at 1199 ("legal control and dominion"); *In re Circuit Alliance, Inc.,* 228 B.R. at 232 ("unfettered *legal* right to use the funds for the possessor's *own* purposes and benefit"); *In re Machinery and Steel Serv., Inc.,* 112 B.R. at 480 ("right of legal control").[20]

Bond Brook was not a "mere conduit" for MPI's funds. It did not hold the funds for transfer to Salem at MPI's behest, at MPI's beck and call. *See Bonded Fin. Servs., Inc.,* 838 F.2d at 893 (one who holds a "check only for the purpose of fulfilling an instruction to make the funds available to someone else" would be a "courier or intermediary"); *accord In re First Sec. Mortgage Co.,* 33 F.3d at 44; *In re Chase & Sanborn Corp.,* 904 F.2d at 600; *In re M. Blackburn Mitchell Inc.,* 164 B.R. at 125; *In re Richmond Produce Co., Inc.,* 151 B.R. at 1021.

Bond Brook had the right to forgo its purchase of Salem's Tahoe. Neither MPI nor Salem had the ability to force Bond Brook to consummate the transaction. Bond Brook was not simply a "channel" for MPI's funds to pass to Salem with "no discretion or authority to do anything else but transmit the money." *In re Finley,* 130 F.3d at 59. *See, e.g., In re Coutee,* 984

F.2d at 141 (law firm with circumscribed control over funds was not an initial transferee of funds in client's trust account); *accord In re Circuit Alliance, Inc.,* 228 B.R. at 233 (same).

The MPI/Bond Brook/Salem transaction proceeded in two distinct steps, rather than in a single, conduit-assisted step. While Bond Brook held the cashier's check the check was "subject to [Bond Brook's] use or control." *In re Chase & Sanborn Corp.,* 904 F.2d at 600. Bond Brook was within "the formal chain of title and possession." *In re Circuit Alliance, Inc.,* 228 B.R. at 234 & n. 15. Thus, I conclude that Bond Brook, rather than Salem, was the initial transferee of MPI's funds. Consequently, Salem may invoke the statutory defenses to defeat the trustee's right of recovery.

### 4. An Uncommon Common–Sense Conclusion

■ All this may seem hyper-technical. But U.C.C. analysis (albeit of an uncommon transaction in an atypical context) leads to a conclusion that squares with common sense. The parties' course of conduct and intentions become more important as the words utilized in negotiating instruments are used in a manner not commonly encountered. *See Equitable Trust Co. v. Rochling,* 275 U.S. 248, 253, 48 S.Ct. 58, 72 L.Ed. 264 (1927).[21] In the some-

---

**20.** Actors who have the power and opportunity but not the legal right to intercept a transfer (say to divert the property to their own use) are not appropriately considered initial transferees. *See In re Video Depot, Ltd.,* 127 F.3d at 1199 ("The mere power of a principal to direct the allocation of corporate resources does not amount to legal dominion and control."); *Rupp,* 95 F.3d at 941 ("[T]he dominion and control test from *Bonded* requires control over the funds and the right to put those funds to *one's own purpose,* not merely the ability to prevent someone else from doing so. ... The Postal Service would be shocked, no doubt, to learn of the potentially staggering financial liability it was assuming for the price of a thirty-[three] cent stamp."); *In re Baker & Getty Fin. Servs., Inc.,* 974 F.2d at 722 (agent's (unexercised) "raw power" to

divert funds to personal extravagances did not make him an initial transferee); *In re Circuit Alliance, Inc.,* 228 B.R. at 233 & n. 13 (attorney's hypothetical ability to misuse her signatory authority over client's funds did not confer initial transferee status).

**21.** The Court reflected:

[T] he words themselves, despite their wide commercial use and the importance of giving them, as far as practicable, a uniform effect, have no rigid and unchangeable significance. Their purpose is to express intention.

*Id.* Unlike the words and objects before me, the *Equitable Trust Co.* Court found that the circumstances of its case indicated that the words at issue, "for account of," were "used with a different object" than was the rule. *Id.*

what unusual, two-remitter transaction before me, MPI (which was itself a *de jure* remitter) designated Bond Brook as the named remitter on the check in order to transfer its rights in the check to Bond Brook. I conclude that Fleet would be obligated to give Bond Brook the funds represented by the check if Bond Brook elected not to purchase the Tahoe from Salem in light of the (readily apparent) expectations the parties held, without reference to Article 3.

My determination harmonizes with the purposes of fraudulent conveyance laws, initial transferee strict liability, and the principles of commercial paper negotiability underlying Article 3.[22] *Bonded Financial Services, Inc.* identified a consanguinity of purpose: to put the risk and burden of inquiry vis-a-vis the transfer of assets, particularly commercial paper, on parties who are in the best position to "monitor" the *bona fides* of the transaction. 838 F.2d at 892–93. The Court stated:

> Just as the holder in due course rule requires the transferor of commercial paper to bear the risk and burden of inquiry, increasing the liquidity of paper, so § 550[ ] leaves with the initial transferee the burden of inquiry and the risk if the conveyance is fraudulent. The initial transferee is the best monitor; subsequent transferees usually do not know where the assets came from and would be ineffectual monitors if they did.

*Id. Accord Rupp*, 95 F.3d at 944.

 Bond Brook was in a position to monitor MPI's role in the transaction at issue. Moreover, the cashier's check's travel from MPI to Bond Brook is no-

where disclosed on the instrument. Salem, understandably, had no facial clue to the check's origin.[23] As far as it knew, it was getting Bond Brook's money. *See Bonded Fin. Servs., Inc.*, 838 F.2d at 894; *compare In re Southeast Hotel Properties Ltd.*, 99 F.3d at 157–58 (transferee "was placed on notice that the funds were drawn from a debtor's accounts" since debtor was listed as remitter), *Rupp*, 95 F.3d at 944 (payees of a cashier's check "had inquiry notice that they potentially were receiving funds to which they were not entitled" when they received the cashier's check to pay the debt of one entity (a conduit) and the check clearly showed another entity (the corporate debtor) as remitter. Thus, liability as initial transferees under § 550(a)(1) was "consistent with considerations of equity and fairness"), *and In re Video Depot, Inc.*, 127 F.3d at 1199 (creditor to whom the corporate debtor's principal owed a gambling debt was "subject [ ] ... to a burden of inquiry" when it took a cashier's check "clearly purchased" by the corporate debtor in payment of the debt, a burden it would not have had had the check been on the personal account of the principal), *with Ross v. United States (In re Auto–Pak, Inc.)*, 73 B.R. 52, 54 (D.D.C. 1987) (cashier's check paid for with funds diverted from corporate debtor by the principal provided the IRS no notice that the source of the money was the debtor and not a second company to whose tax obligation payment was directed).

### Conclusion

Salem was not the initial transferee of MPI's funds. It is not strictly liable to the

---

**22.** I distinguish invoking equity to cobble together a "just" solution to a particular case, *see supra* note 7, from applying the law with an understanding of the objectives that animate it, striving to do the latter.

**23.** Salem relishes the hypothetical case invoked by Judge Easterbrook to illustrate his fraudulent conveyance reflections:

> There have always been limits on the pursuit of transfers. If the recipient of a fraudulent conveyance uses the money to buy a Rolls Royce, the auto dealer need not

return the money to the [debtor] even if the trustee can identify the serial numbers on the bills. The misfortune of the firm's creditors is not a good reason to mulct the dealer, who gave value for the money and was in no position to monitor the debtor. Some monitoring is both inevitable and desirable, and the creditors are in a better position to carry out this task than are auto dealers and the many others with whom the firm's transferees may deal.

*Bonded Fin. Servs., Inc.*, 838 F.2d at 892.

trustee. The parties having stipulated that Salem may lay claim to § 550(b)'s defenses, judgment for Salem will enter.